2012 ME 14

**STATE of Maine**

v.

**Chad T. GURNEY.**

Supreme Judicial Court of Maine.

Argued: Jan. 10, 2012.
Decided: Feb. 7, 2012.

894

Sarah A. Churchill, Esq. (orally), Strike, Goodwin & O'Brien, Portland, on the briefs, for appellant Chad T. Gurney.

William J. Schneider, Attorney General, and Donald W. Macomber, Asst. Atty. Gen. (orally), Augusta, on the briefs, for appellee State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

ALEXANDER, J.

[¶ 1] Chad T. Gurney appeals from judgments of conviction for murder, 17–A M.R.S. § 201(1)(A) (2011), and arson (Class A), 17–A M.R.S. § 802(1)(A) (2011), entered in the Unified Criminal Docket (Cumberland County, *Cole, J.*) following a jury-waived trial.[1] On appeal Gurney argues that the court erred in (1) denying his motions to suppress evidence found on Gurney's Facebook account, laptop computer, and cell phone because the warrants obtained for the searches, and affidavits on which they were based, did not support findings that evidence of a crime would be found in those locations; (2) admitting evidence of a reference to a beheading video found in unallocated space on the hard drive of Gurney's laptop computer; (3) not addressing in its findings the journals and e-mails that Gurney offered as evidence of his preexisting and ongoing psychosis;[2] and (4) finding that Gurney did not carry his burden of proving, by a preponderance of the evidence, that he suffered from a mental disease or defect that substantially affected his ability to appreciate the wrongfulness of his conduct, 17–A M.R.S. § 39 (2011). Finding no error, we affirm the judgment.

## I. CASE HISTORY

[¶ 2] The following facts are drawn from the court's written judgment, as sup-

---

1. Title 17–A M.R.S. § 201(1)(A) (2011) provides that a person is guilty of murder if the person "[i]ntentionally or knowingly causes the death of another human being."

 Title 17–A M.R.S. § 802(1)(A) (2011) provides that a person "is guilty of arson if he starts, causes, or maintains a fire or explosion ... [o]n the property of another with the intent to damage or destroy property thereon."

2. In its written judgment, the court met all requirements of Rule 23(c) of the Unified Criminal Docket (Cumberland County). It found as fact each element of the offenses charged, and those findings demonstrated that the court applied a correct understanding of the controlling law. *See* U.C.D.R.P.-Cumberland County 23(c); *see also State v. Greenleaf*, 2004 ME 149, ¶ 29, 863 A.2d 877.

 The court is not required to address each piece of admitted evidence in its findings, *see State v. Ricky G.*, 2000 ME 190, ¶¶ 1–5, 760 A.2d 1065, and there no evidence to support Gurney's claim that the court failed to consider the e-mails and journals in its deliberation. If the court accorded the e-mails and journals little weight or significance, it was within its province to do. *See State v. Connor*, 2009 ME 91, ¶ 9, 977 A.2d 1003. We do not address this argument further.

ported by the record, viewing the evidence in a light most favorable to the State, pursuant to our standard of review of fact-findings. *See State v. Milliken*, 2010 ME 1, ¶ 2, 985 A.2d 1152.

*Facts Underlying the Murder and Arson Charges*

[¶ 3] Chad T. Gurney, then twenty-seven, met the victim, age eighteen, in Portland in March 2009, and they subsequently began a romantic relationship. Although Gurney later stated that he did not consider theirs to be an exclusive relationship, evidence indicated that Gurney had intense feelings for the victim.

[¶ 4] In May, Gurney took a one-week trip to Canada. After returning to Portland on May 20, 2009, Gurney asked the victim to take a trip with him, but she declined. Gurney made plans to leave for Thailand in late May. On or around May 23, 2009, the victim told Gurney that she had been intimate with another man while Gurney was in Canada.

[¶ 5] On May 25, 2009, the victim spent the day at Gurney's apartment. She apologized for having been intimate with someone else and took an afternoon nap in Gurney's bed in the apartment's loft. While the victim was lying on the bed, Gurney grasped the victim by the neck, head-butted her, and strangled her until she was dead. Gurney performed a sexual act on, and then decapitated, the victim's body.

[¶ 6] Gurney then showered and changed his clothes, drove to a gas station, obtained a container, filled it with gas, and brought it back to his apartment. Gurney poured gasoline on the bed, the victim's body, and all of her personal belongings, trailed the gasoline from the bed to the steps of the loft, and then ignited the gasoline. Gurney also poured gasoline in two areas in the lower level of the apartment.

[¶ 7] Gurney collected the bag and passport that he had packed for his trip abroad, his laptop computer, and an empty shotgun, and put them in his truck. He then drove to Old Orchard Beach, stopped at an ATM, and paid cash to rent a hotel room for two nights. Gurney apparently asked the motel clerk for suggestions for where to eat dinner and later used the motel's hot tub.

[¶ 8] Portland firefighters responded to Gurney's apartment at approximately 6:30 p.m. on May 25 where they discovered the victim's body.

[¶ 9] When Gurney's neighbor called him to inform him of the fire, Gurney told the neighbor that he was on his way to Lewiston and hung up.

[¶ 10] In the early morning hours of May 26, 2009, Gurney's best friend spoke with Gurney by cell phone. Gurney, sounding calm and rational, admitted to his friend that he murdered the victim, saying that the victim had done something to hurt him, that he was tired of being hurt, and had "lost it." While he was speaking with Gurney, the friend was stopped by a Portland patrol officer for a minor traffic violation. Gurney asked his friend to explain to the police officer that Gurney had been in an accident and "might not be all there mentally" as a result. Gurney was referring to a vehicular accident in 2005 that had resulted in serious physical injuries to Gurney's legs, back, and arm and may also have caused a mild head injury.

[¶ 11] After talking to his best friend, Gurney turned himself in to the police, admitted to killing the victim, and gave a detailed account of how it occurred. In his statement to the police Gurney admitted that he knew that killing the victim was wrong. Gurney also consented to a search of his motel room and vehicle. Police seized Gurney's laptop, which was on but in "sleep" mode, from his motel room and

also recovered Gurney's cell phone, a device with internet access and text messaging functions.

[¶ 12] During multiple conversations and interviews with Gurney on May 26, the police observed no evidence that Gurney was suffering from delusional thinking. Gurney explained to police that the victim was "a bright, wonderful being and I lost it and I feel terrible." Gurney did report to a social worker during his intake at the Cumberland County Jail on May 26, 2009, that he was hearing voices and "seeing signs" before and after killing the victim. He also reported to the social worker, however, that his killing of the victim resulted partially from his "impulsive anger." About a month after the crimes, Gurney reported to the social worker and to others that the crime "never would have happened" if he had seen love letters that the victim had written to him and that he read only after her death.

### Gurney's Mental Health History

[¶ 13] In 2005, three months after the vehicular accident in which Gurney had been seriously injured, an examining physician found that Gurney had a number of cognitive defects (problems with attention, memory, language, and math), but no psychotic symptoms. In 2007, Gurney was treated for anxiety and depression and diagnosed with "organic personality disorder." [3] Gurney was also diagnosed with post-traumatic stress disorder, but there was no evidence of thought disorder or delusions. Gurney did not report to the doctor that he was hearing voices or having delusions. The doctor noted, however,

that Gurney "continues to have significant distress re his relationships to women."

[¶ 14] Gurney had been medicated for pain with a strong, prescription narcotic, from which he effectively weaned himself by March 2009. Although Gurney was given a prescription for a different, less potent, pain reliever, there is little evidence that Gurney ever took this pain reliever and no evidence that he took it in the weeks or month before he killed the victim. Gurney also self-medicated with marijuana.

[¶ 15] According to friends, it was not unusual for Gurney to "see signs" in everyday events, both before and after his 2005 accident, and to attribute importance to those signs. Gurney's friends never observed Gurney having delusions or mental health issues or heard Gurney make claims to that effect.

### Procedural History and Examinations for Mental Disease or Defect

[¶ 16] Gurney was charged with one count of murder and one count of arson. He entered a plea of not criminally responsible by reason of mental disease or defect at his arraignment. Gurney underwent a three-stage examination and was assessed by several psychologists and psychiatrists. Gurney's explanation for killing the victim changed over the course of these interviews.

[¶ 17] Gurney first met with a psychologist four times in June and July 2009. Gurney explained to him that "[the victim] was just laying there. I walked up the steps, I looked at her with a blank look, and I did what I did. The last couple of

**3.** Gurney's trial expert testified that organic personality disorder:
> involves sufficient trauma to the brain as a whole so that a person's sense of identity, their ability to maintain perspective, not to overreact to annoyances begins to get, becomes restricted and diminished. Such

> people become extremely irritable.... Such people may also ... tend to oscillate between a one [sic] being quite paranoid at times and distrustful, on the other hand being extremely naive, and extremely easy to be influenced.

days she had been at my heels. I misread it. I got arrogant rather than loving and nurturing her. I had such a problem with women that this is how it finally came out." Gurney also stated, "You don't kill people. I knew it was wrong." Gurney denied that the victim's recent sexual encounter with another man was related to his killing her.

[¶ 18] In three interviews with a psychiatrist occurring around this time, however, Gurney admitted that the victim's having been with someone else "hurt a lot" and "deflated" him. He also stated, "I was so sick of it—like every [expletive] girlfriend I'd ever had—every [expletive] woman.... Part of me was saying, 'Why do you do anything nice for her? She slept with someone while you were gone one week.'" The psychiatrist found no evidence of Gurney's responding to internal stimuli such as hearing voices or experiencing delusional thinking.

[¶ 19] In November 2009, Gurney told a forensic psychologist that he had been listening to a particular band's music on the day of the killing, that the lyrics described how he felt, and that the "universe was pushing me to hurt her," a disclosure that the psychologist found not credible because Gurney had never referenced it before. Gurney told the psychologist that his urge to kill the victim became "overwhelming," so he killed her.

[¶ 20] Gurney explained to these three mental health professionals that, after he killed the victim, he figured that he had done one horrible thing already, and was just thinking about what is the next more horrible thing to do, which is why he engaged in damaging acts with the victim's body after he killed her.

[¶ 21] On August 13 and November 12, 2010, more than a year after killing the victim, Gurney was examined by a psychiatrist hired by the defense. Gurney told this psychiatrist that his spiritual advisor instructed him to set aside everything in his life in order to go on a journey with him and that this was "the ultimate test." Gurney also stated that he did not believe he was killing the victim because they shared eternal life, that he and the victim had shared these beliefs and values, and that Gurney was performing a ritual of purification for eternal life by "strangling, beheading, or fire."

[¶ 22] On May 10, 2010, Gurney filed a motion to suppress evidence obtained from a search of his laptop computer, his iPod, and his cell phone as a result of an allegedly defective search warrant. The court ruled in a detailed order that the search warrants and supporting affidavits were sufficiently credible and contained sufficiently detailed facts to provide the court with a substantial basis upon which to conclude that the detectives had probable cause to search the laptop and the cell phone. The court therefore denied Gurney's motion to suppress evidence derived from those two devices. The court did grant Gurney's motion to suppress evidence with respect to the iPod.

[¶ 23] Gurney also filed a motion to suppress evidence obtained from his Facebook account as a result of an allegedly defective search warrant, which the court denied. No evidence relating to Gurney's Facebook account was ultimately admitted or referred to at trial.

[¶ 24] The court held a nine-day jury-waived trial beginning January 10, 2011. A detective specializing in forensic computer analysis testified, without objection, to the content of text messages made and received on Gurney's cell phone from the day before the victim was killed through the day after.

[¶ 25] Before trial, Gurney had filed a motion in limine seeking to exclude evidence of any material found or referenced on Gurney's laptop relating to a video of a

female being beheaded. No video was found on the computer, only a reference to material that appeared to derive from an internet site address, which indicated that a beheading video might have been accessed on Gurney's computer sometime before the homicide. Gurney argued in the motion and at trial that the State could not provide a proper foundation for the admission of that evidence and that the danger of unfair prejudice vastly outweighed the evidence's probative value. The court allowed the State to lay a foundation to admit testimony relating to finding the reference to the beheading video on Gurney's computer and ultimately admitted the testimony.

[¶ 26] Gurney's expert witness opined at trial that, on May 25, 2009, Gurney suffered from a psychotic disorder, with delusions, due to brain injury, chronic pain, and withdrawal from prescription medication. His expert concluded that Gurney had neither the capacity to act knowingly or intentionally nor the substantial capacity to appreciate the wrongfulness of his actions when he killed the victim and set the fire. This differs from the opinion of each of the previous examining physicians and psychologists, although all of the examining physicians and psychologists agreed that Gurney had a schizotypal personality disorder.[4]

[¶ 27] The court found the reports of physicians and psychologists who had examined Gurney closer to the May 25, 2009, events more credible than that of Gurney's expert, who examined him over a year later.

[¶ 28] On February 4, 2011, the court found Gurney guilty of murder and arson as charged. The court entered a thought-ful and thorough written judgment, with comprehensive findings of fact. The court found that the evidence indicated that this was a domestic-violence homicide, and that Gurney was reacting to the victim's having been intimate with another man when, intentionally or knowingly, he strangled her. The court found no credible evidence that Gurney suffered from any psychiatric or medical condition that supported his contention that he was not criminally responsible by reason of insanity for murdering the victim and setting the fire. The court also did not find credible that Gurney's use of prescription drugs was a significant factor to explain his actions on May 25, 2009.

[¶ 29] The State filed a motion to clarify the verdict's discussion of Gurney's and the State's respective burdens of proof relating to Gurney's affirmative and nonaffirmative defenses, which was granted. Gurney was sentenced to fifty years for murder and twenty-five years for arson, all but ten years suspended (and four years' probation), to be served consecutively to the sentence on the murder conviction. Gurney filed a timely notice of appeal and an application for sentence review, M.R.App. P. 20, which application was denied. This appeal followed.

## II. LEGAL ANALYSIS

**A. Denial of Motion to Suppress Evidence Retrieved from Gurney's Laptop Computer and Cell Phone**

[¶ 30] Focusing on the "nexus" element of a probable cause determination to support issuance of a warrant, Gurney argues that the affidavit offered in support of a finding of probable cause to search Gurney's laptop computer and cell phone

---

4. Gurney's expert described schizotypal personality disorder, not as a major mental illness, but as "an adaptation to life where you become isolated, you tend to avoid contact with people, you tend to retreat to some ex-tent into your own inner world. You tend to spend a good deal of time with fantasies. You see it sometimes with kids, for example, who play video games over and over ... and just get lost in those."

did not establish that evidence relating to the crimes with which Gurney was charged would be found on those devices. He argues, therefore, that the motion court erred when it denied his motion to suppress evidence obtained from those devices.[5] We review the denial of a motion to suppress for clear error as to factual issues and de novo as to issues of law. *State v. Reese*, 2010 ME 30, ¶ 4, 991 A.2d 806.

 [¶ 31] The Fourth Amendment of the United States Constitution requires a showing of probable cause, as supported by oath or affirmation, before a search warrant may be issued. *See id.* ¶ 11. In determining whether a search warrant affidavit sufficiently establishes probable cause, we review directly the finding of probable cause made by the judicial officer when the warrant was issued, giving that finding "great deference." *State v. Nigro*, 2011 ME 81, ¶ 26, 24 A.3d 1283. Accordingly, we read the search warrant affidavit "in a positive light and consider all reasonable inferences that may be drawn from information in the affidavit." *State v. Samson*, 2007 ME 33, ¶ 11, 916 A.2d 977.

 [¶ 32] In reviewing a probable cause determination, we apply a "totality of the circumstances" test, *see Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), which "requires a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ... including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Gdovin*, 2008 ME 195, ¶ 9, 961 A.2d 1099.

 [¶ 33] "To meet the standard for probable cause, the warrant affidavit must set forth some nexus between the evidence to be seized and the locations to be searched." *Samson*, 2007 ME 33, ¶ 15, 916 A.2d 977. The nexus "need not, and often will not, rest on direct observation, but rather can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime]." *Id.*

 [¶ 34] In this case, a Portland police detective submitted an affidavit in support of his request for a search warrant for Gurney's laptop and cell phone. Although Gurney had taken his laptop and cell phone from the crime scene to the hotel room he rented after leaving the scene, he had left the computer in the hotel room when he turned himself in to the police. With this history as stated in the affidavit and reasonably inferred from the information contained therein, and giving the affidavit a positive reading, the affidavit established a fair probability that evidence of a crime would be found on both Gurney's laptop and cell phone. The motion court did not err in denying Gurney's motion to suppress with respect to evidence obtained from those items.

---

5. Gurney also argued that the court erred in denying his motion to suppress evidence obtained from his Facebook account. However, as confirmed at oral argument, no evidence obtained from that account was introduced or admitted at trial. Gurney's argument on appeal with respect to his Facebook account is therefore moot. *See United States v. Arias–Villanueva*, 998 F.2d 1491, 1502 (9th Cir. 1993) (implicitly overruled in part on other grounds by *United States v. Gaudin*, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), as discussed in *United States v. Jimenez–Ortega*, 472 F.3d 1102, 1104 (9th Cir.2007)); *United States v. Brown*, 584 F.2d 252, 255 (8th Cir.1978); *United States v. King*, 532 F.2d 505, 510 (5th Cir.1976); *see also State v. Williams*, 412 A.2d 1222, 1224 (Me.1980).

## B. Admission of Evidence of a Reference to a Video Found on Gurney's Laptop

[¶ 35] Gurney argues that the court erred in admitting evidence found in the unallocated space on the hard drive of Gurney's laptop computer consisting of a reference to a video involving a woman who was beheaded for cheating because (1) the State failed to establish a proper foundation to admit that evidence when it failed to establish how and when the reference got onto Gurney's computer, or that Gurney ever viewed the reference or the associated video; and (2) the evidence was not demonstrably relevant, and the probative value, if any, of the evidence was substantially outweighed by the risk of unfair prejudice.

[¶ 36] When, as here, a party has preserved an objection to the admissibility of evidence, we review the court's determination of relevance for clear error and its weighing of the probative value of the evidence against the risk of unfair prejudice for an abuse of discretion. *State v. Roberts*, 2008 ME 112, ¶ 21, 951 A.2d 803. Additionally, we review the admission of evidence over an objection for lack of foundation for an abuse of discretion, but review underlying factual findings for clear error. *See State v. Tucker*, 2009 ME 38, ¶ 15, 968 A.2d 543. "A trial court commits 'clear error' on evidence questions when its findings regarding the foundation for admitting or excluding evidence are not supported by facts in the record." *Id.*

[¶ 37] A computer crimes forensic investigator testified, over Gurney's objection, that he found the word "behead" as part of a caption in unallocated space on the hard drive of Gurney's laptop.[6] The caption read in part, "Description: woman half-beheaded for suspected cheating. Well at least if she was cheating she won't do it again." Based on the precise language and formatting of the caption, the specialist traced the caption referenced in the computer's unallocated space to a website that shows violent videos. When the investigator visited the website, he saw that the exact caption found in the unallocated space on Gurney's computer was accompanied by a thumbnail picture of the video and, apparently, by a link to the video itself. This thumbnail and caption were one of a list of numerous videos available for viewing.

[¶ 38] The specialist testified, and the evidence otherwise indicated, that the video was posted on the website on February 28, 2009, and that the website page containing the caption to the video was present on Gurney's computer screen at some time prior to the computer's seizure on May 26, 2009. The specialist testified that it would not have been possible for the reference to have been placed on the laptop's computer after it was seized. Direct examination and cross-examination indicated that the specialist could not tell how the reference got onto Gurney's computer, if or when the computer's user actually saw the caption, who was using Gurney's computer at the time the caption was displayed on the computer, or whether the video associated with the caption was viewed.

[¶ 39] We first conclude that the challenged evidence was relevant to an

---

6. Unallocated space "on a computer electronic storage device pertains to storage area on the disk that the disk's directory identifies as available to receive and store new files." It was explained at trial:

> [T]he process of deleting [a] file doesn't necessarily make that file disappear from the disk, it merely states that when you delete a file, ... the physical space on that disk that that file currently occupies is now available to receive new information but until there's information written on top of it, that data is still available for searching, analysis, et cetera.

issue central to this case—Gurney's state of mind when he killed the victim and decapitated her body after learning that she had a sexual encounter with another man. As this evidence related to Gurney's state of mind, the central contested issue in the trial, the probative value of the evidence was not outweighed by the danger of unfair prejudice. *See* M.R. Evid. 401, 403; *State v. Dilley*, 2008 ME 5, ¶¶ 26–28, 31–32, 938 A.2d 804; *State v. Millay*, 2001 ME 177, ¶ 11, 787 A.2d 129 (emphasizing the wide discretion granted to trial courts to determine whether the value of the proffered evidence is substantially outweighed by the danger of unfair prejudice).

[¶ 40] Second, the State introduced sufficient facts to provide an adequate foundation to establish the relevance of the challenged evidence and its admissibility as a piece of circumstantial evidence concerning Gurney's state of mind. *See State v. Wilbur*, 278 A.2d 139, 143 (Me.1971). The caption was found in the unallocated space of a laptop computer that indisputably belonged to Gurney and which was found in his possession when he was arrested; the caption could be traced in its exact formatting to a website showing violent videos; the caption and the associated video were posted on the website in February 2009; and the caption appeared on Gurney's computer sometime prior to his arrest.

[¶ 41] The deficiencies in the evidence challenged here—the acknowledged inability to determine how and when the caption appeared on Gurney's computer, whether Gurney was the user at the time, or whether he ever saw the caption or the video

associated with the caption—go to the weight of the evidence, not to the adequacy of the foundation for admitting it. *See id.; see also Marois v. Paper Converting Machine Co.*, 539 A.2d 621, 625 (Me.1988) (holding that even limited evidence may be sufficient to lay a foundation for the admission of the challenged evidence and that "any alleged weakness of the foundation should go to the weight to be given the evidence by the [fact-finder]; any deficiency therein [can be] exposed on cross-examination").

[¶ 42] The court did not err or abuse its discretion when it admitted the challenged evidence.

C. Insufficiency of the Evidence of Mental Disease or Defect

[¶ 43] Relying on testimony by Gurney's expert, Gurney argues that the evidence showed that when he killed the victim he was having a psychotic episode attributable to his "schizotypal personality disorder and brought on by stress and withdrawal from Tramadol" and that this psychotic episode "deprived [him] of the ability to appreciate the wrongfulness of his actions and rendered him not criminally responsible for [the victim's] death due to his organic mental defect." Accordingly, Gurney argues that the trial court made an "inappropriate assessment of the evidence" and that the evidence compelled a finding, pursuant to 17–A M.R.S. § 39, that he was not criminally responsible for the homicide and arson.[7]

■ [¶ 44] We review the evidence, and any reasonable inferences that may be drawn from it, most favorably to the result

7. Gurney also suggests that the record contained sufficient evidence of an abnormal condition of mind to raise, pursuant to 17–A M.R.S. § 38 (2011), a reasonable doubt as to the existence of a required culpable state of mind. The record evidence is sufficient for

the court, as fact-finder, to rationally find that Gurney had the requisite state of mind to support convictions for murder and arson. *See* 17–A M.R.S. §§ 201(1)(A), 802(1)(A); *State v. Abbott*, 622 A.2d 723, 725–26 (Me. 1993).

reached by the trial court. *See State v. McMahan*, 2000 ME 200, ¶ 13, 761 A.2d 50.

[¶ 45] A defendant is "not criminally responsible by reason of insanity if, at the time of the criminal conduct, as a result of mental disease or defect, the defendant lacked substantial capacity to appreciate the wrongfulness of the criminal conduct." 17–A M.R.S. § 39(1). " '[M]ental disease or defect' means only those severely abnormal mental conditions that grossly and demonstrably impair a person's perception or understanding of reality." 17–A M.R.S. § 39(2). This is an affirmative defense that the defendant is required to prove by a preponderance of the evidence. *State v. Abbott*, 622 A.2d 723, 726 (Me.1993).

[¶ 46] Whether a defendant proved that he was not criminally responsible is a question of fact for the fact-finder. *Id.* When the court, sitting as the fact-finder, has made a factual finding adverse to the party with the burden of proof, we will overturn the trial court's finding "only if the record compels a contrary conclusion." *State v. Pulsifer*, 1999 ME 24, ¶ 14, 724 A.2d 1234; *see also Abbott*, 622 A.2d at 726 (stating that we will disturb the verdict "only upon a strong showing that no fact finder could reasonably conclude otherwise than that the defendant lacked criminal responsibility for his conduct").

[¶ 47] We do not need to reiterate here the evidence upon which the court based its judgment. There was more than sufficient evidence from which the court could reasonably conclude that Gurney was criminally responsible for his conduct. *See State v. Condon*, 468 A.2d 1348, 1351 (Me. 1983). Based on this record, the court was not compelled to conclude otherwise.

The entry is:

Judgment affirmed.