MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:     2015 ME 62
Docket:       Ken-14-313
Argued:       April 7, 2015
Decided:      May 12, 2015

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, and JABAR, JJ.

## STATE OF MAINE

v.

## MARK P. MURPHY

JABAR, J.

[¶1]  Mark P. Murphy appeals from a judgment of conviction of elevated aggravated assault (Class A), 17-A M.R.S. § 208-B(1)(A) (2014); elevated aggravated assault (Class A), 17-A M.R.S. § 208-B(1)(B) (2014); and aggravated assault (Class B), 17-A M.R.S. § 208(1)(A) (2014), entered by the trial court (*Marden, J.*) after a jury-waived trial.  Although Murphy raises several issues on appeal, we focus on his arguments that (1) the court erred by failing to ensure that he knowingly and voluntarily waived his right to testify on his own behalf, (2) the evidence presented at trial compelled a conclusion that he was not criminally responsible for his conduct, and (3) the court erred by sentencing him on duplicative criminal charges for the same conduct in violation of constitutional protections against double jeopardy.  We vacate the judgment and remand to the

2

trial court for consolidation of the three counts through entry of a single conviction, and for entry of a sentence on the single charge.

## I.  BACKGROUND

[¶2]  "The following facts are drawn from the court's written judgment, as supported by the record, viewing the evidence in a light most favorable to the State . . . ."  *State v. Gurney*, 2012 ME 14, ¶ 2, 36 A.3d 893.

[¶3]  Mark Murphy was involuntarily committed to Riverview Psychiatric Center (Riverview) in 2006.  He was later diagnosed with schizoaffective disorder, post-traumatic stress disorder, personality disorder, and bipolar disorder with psychosis.

[¶4]  On March 15, 2013, Murphy was informed that his usual weekend trip to visit his parents was cancelled due to Riverview's staff's concerns about Murphy's increasing paranoia and delusional thinking.  Murphy responded to the revocation of his "pass" with anger and frustration, as he "felt that the postponement was arbitrary and punitive."

[¶5]  The next day, March 16, Murphy asked to review his medical records, to go on an unsupervised walk, and to Skype with his parents.  A Riverview nurse instructed him on how to make a formal request for his medical records, which Murphy did, and told him that he would not be allowed to go on a walk or go to the computer lab unsupervised.  These are privileges Murphy would normally have,

but the nurse did not allow them because she had safety concerns. Murphy went to his room without incident.

[¶6] A short while later, the victim, a Riverview mental health worker, conducted a resident check on Murphy's floor. Murphy had, in the past, said that he did not like the victim and did not want her on his floor. Murphy came out of his room, saw the victim, and then turned and entered the bathroom. As the victim went to check the bathroom, she felt someone breathing down her neck behind her. She turned and saw Murphy standing directly behind her. Murphy said, "I'm sorry," and began stabbing the victim with the tip of a pen. Murphy continuously struck the victim as she lay in the fetal position, covering her face with her hands.

[¶7] Another Riverview worker ran over to help as Murphy knelt on the ground and continuously swung at the victim. Murphy inadvertently struck the other worker with his elbow as he swung at the victim, knocking the other worker to the floor. Murphy, who had threatened the other worker with physical violence in the past, then turned and started to come toward her before another Riverview patient was able to subdue him.

[¶8] Murphy was restrained and placed in a seclusion room. He appeared angry and was aggressive and hostile toward Riverview staff. Days after the assault, Murphy expressed his rage at Riverview staff for having revoked his privileges, and particularly blamed the staff for cancelling his visit with his

4

parents. As late as four days after the assault, Murphy angrily denounced the unfairness of his being denied a pass, and referred to the pass system as "a game." He did not, at that time, offer any explanation for the attack, and he told his psychiatrist that he did not recall the incident.

[¶9] The victim sustained injuries to her forehead, face, and hand, and had visible scarring at the time of trial. She underwent surgery and, at the time of trial, was engaged in therapy to regain strength in her hand.

[¶10] On April 17, 2013, Murphy was indicted on two counts of elevated aggravated assault and one count of aggravated assault. Count I alleged that Murphy "intentionally or knowingly cause[d] serious bodily injury . . . with the use of a dangerous weapon, a pen." *See* 17-A M.R.S. § 208-B(1)(A). Count II alleged that he "engage[d] in conduct that manifested a depraved indifference to the value of human life and . . . caused serious bodily injury . . . with the use of a dangerous weapon, a pen." *See* 17-A M.R.S. § 208-B(1)(B). Count III alleged that he "intentionally, knowingly, or recklessly cause[d] serious bodily injury to [the victim]." *See* 17-A M.R.S. § 208(1)(A).

[¶11] In June, during meetings with a forensic psychologist, Dr. Andrew Wisch, and a forensic psychiatrist, Dr. Carlyle Voss, Murphy reported for the first time that he had attacked the victim because he wanted to marry her but, because she was already married, knew he could not. He told the forensic examiners that,

because the victim's vows included "'til death do you part," he decided that he could marry her if he killed her and then brought her back to life. He explained that when he went into the bathroom just before the assault, he observed a clogged toilet and interpreted that as a sign that he had to go through with the assault. He said that he had apologized to the victim because he knew he was taking her away from her husband.

[¶12] Murphy pleaded not criminally responsible by reason of insanity, *see* 17-A M.R.S. § 39 (2014), and a bench trial was held on October 1, 2013.

[¶13] At trial, Wisch testified that he was skeptical of Murphy's explanation for the assault because the circumstances did not corroborate Murphy's reported motivation for attacking the victim. Wisch testified that there was no evidence that Murphy was misperceiving reality or was unaware of what he was doing at the time of the assault, pointing particularly to the fact that he said "I'm sorry" right before the attack. Wisch stated that this, as well as other interactions Murphy had had with Riverview staff throughout the day, was indicative of reality-based thinking on Murphy's part. He testified that "the most prominent theme" both before and after the assault was Murphy's anger toward the staff for revoking or delaying his privileges. Wisch opined that the circumstances suggested that Murphy had the capacity to appreciate the wrongfulness of his actions at the time of the assault.

6

[¶14]  The State rested after Wisch's testimony.  The court, cognizant of timing, asked Murphy's counsel how many witnesses he intended to call. Murphy's counsel replied, "Just Dr. Voss, Your Honor."  Murphy's counsel then called Voss to the stand.

[¶15]  Voss opined that, at the time of the attack, Murphy was having psychotic delusions that impaired his ability to appreciate the wrongfulness of his actions.  Voss testified that Murphy's mental state had been deteriorating in the week before the assault, and that Murphy had been having psychotic perceptions including paranoia about the staff interfering with his food.  He testified that, in his opinion, it was not Murphy's anger about his privilege revocation that led to the assault, but rather Murphy's psychotic delusions.  After Voss's testimony, the defense rested.

[¶16]  On January 23, 2014, the court issued a written judgment finding Murphy guilty of all three counts.  The court found that Murphy's explanation was "simply an attempt to create some psychotic explanation for a fit of anger," and concluded that Murphy "presented insufficient evidence that it is more likely than not that at the time of the attack [he] was suffering from a severely abnormal mental condition that grossly and demonstrably impaired his perception or understanding of reality."  *See* 17-A M.R.S. § 39(2).  The court sentenced Murphy to fifteen years in prison, all but ten years suspended, and two years of probation

on Count I; a concurrent five-year sentence, all suspended, and two years' probation on Count II; and a concurrent two-year sentence, all suspended, and two years' probation on Count III. Murphy appeals to us from the conviction and the sentence. *See* 15 M.R.S. § 2115 (2014); M.R. App. P. 2(b)(2)(A). The Sentence Review Panel denied leave to appeal from the sentence.

## II. DISCUSSION

[¶17] We are unpersuaded by Murphy's argument that there was insufficient evidence of "serious bodily injury" to sustain an assault conviction, 17-A M.R.S. §§ 208(1)(A), 208-B(1)(A)-(B); *see also* 17-A M.R.S. § 2(23) (2014), and do not discuss this argument further. We focus on Murphy's arguments that the court failed to ensure that he knowingly and voluntarily waived his right to testify, that the evidence compelled a determination that he was not criminally responsible, and that the court unconstitutionally sentenced him on duplicative charges for a single incident.

A.     Waiver of Right to Testify

[¶18] Murphy argues that, because the record is silent as to whether he was aware of his right to testify and as to whether he waived that right personally or through counsel, we must presume that there was no voluntary or intentional waiver. We review "the ultimate issue of waiver" de novo. *State v. Ericson*, 2011 ME 28, ¶ 15, 13 A.3d 777 (quotation marks omitted).

8

[¶19]  We have recognized that "waiver of the right to testify is a flexible concept that may be determined from the totality of all the circumstances, but that must also be balanced with the privilege against self-incrimination because the waiver of one is 'essentially an election of the other.'" *State v. Ford*, 2013 ME 96, ¶ 19, 82 A.3d 75 (quoting *State v. Tuplin*, 2006 ME 83, ¶ 16, 901 A.2d 792).

[¶20]  In *Ford*, we required "that the record demonstrate that *unrepresented* defendants are aware of and [understand] their right to testify as well as their correlative right not to testify." *Id*. ¶ 20 (alterations omitted) (quotation marks omitted).  Recognizing that it is a lawyer's duty to advise a client as to his or her rights, we declined to require trial courts to extend the same practice to represented defendants.  *Id*. ¶¶ 20-21.  In the absence of evidence to the contrary, we assume that represented clients were properly advised of their right to testify.  *Id*. ¶ 21.

[¶21]  We decline to adopt the bright-line rule Murphy urges on appeal.  Because Murphy was represented by counsel and because the record does not indicate otherwise, we assume that he was apprised of his constitutional right to testify.  In these circumstances, the trial record need not demonstrate an express waiver for us to conclude that Murphy voluntarily and intentionally waived his constitutional right to testify.

B.      Sufficiency of Evidence of Mental Disease or Defect

[¶22]   Relying primarily on Dr. Voss's testimony, Murphy argues that the evidence compelled a determination that he was not criminally responsible for the assault by reason of insanity. *See* 17-A M.R.S. § 39.  In considering a challenge to the sufficiency of the evidence, "[w]e review the evidence, and any reasonable inferences that may be drawn from it, most favorably to the result reached by the trial court." *Gurney*, 2012 ME 14, ¶ 44, 36 A.3d 893.

[¶23]   Pursuant to 17–A M.R.S. § 39(1), "[a] defendant is not criminally responsible by reason of insanity if, at the time of the criminal conduct, as a result of mental disease or defect, the defendant lacked substantial capacity to appreciate the wrongfulness of the criminal conduct."  "'[M]ental disease or defect' means only those severely abnormal mental conditions that grossly and demonstrably impair a person's perception or understanding of reality." *Id*. § 39(2).  To successfully assert the defense, a defendant must prove by a preponderance of the evidence that he was not criminally responsible by reason of insanity. *Gurney*, 2012 ME 14, ¶ 45, 36 A.3d 893.

[¶24]   "Whether a defendant proved that he was not criminally responsible is a question of fact for the fact-finder." *Id*. ¶ 46.  "When the court . . . has made a factual finding adverse to the party with the burden of proof, we will overturn the

trial court's finding only if the record compels a contrary conclusion." *Id.* (quotation marks omitted).

[¶25]  It was within the purview of the court to resolve any factual issues and determine whether Murphy proved by a fair preponderance of the evidence that he lacked the requisite capacity to be criminally responsible for his conduct, and Murphy's commitment to Riverview did not give rise to any presumption of mental incapacity that would excuse him from criminal responsibility.  *See State v. Gatcomb*, 389 A.2d 22, 25-26 (Me. 1978).  Further, the court was free to accept or reject the opinions of the competing experts, Dr. Wisch and Dr. Voss.

[¶26]  It was not error for the court to accept Dr. Wisch's testimony that Murphy's actions derived from anger and not, as Dr. Voss testified, from mental disease or defect.  The record does not compel a contrary conclusion.

C.    Double Jeopardy

[¶27]  The record demonstrates that the State charged Murphy with multiple counts "not to charge separate criminal acts, but as alternative charges for the same criminal act."  *State v. Robinson*, 1999 ME 86, ¶ 12, 730 A.2d 684.  Although M.R. Crim. P. 7(c) allows for alternative charging when the same criminal act may have been completed in several ways, charging a defendant with multiple crimes for the same criminal act implicates the defendant's right to be free from double

jeopardy as guaranteed by U.S. Const. amend. V and Me. Const. art. I, § 8. *Id*. ¶¶ 12, 14.

[¶28] When, as here, the State presents its alternative charging theories as multiple counts based on one criminal act, "court action to consolidate the duplicative counts is appropriate to assure that a person cannot be convicted or punished more than once for the same criminal act." *Id*. ¶ 13. Although it is clear from the record that the court contemplated that it was sentencing Murphy for a single incident, and not three separate assaultive acts, the court did not consolidate the duplicative counts prior to entering its judgment of conviction or its sentence. There must be a single operative charge upon which Murphy was convicted and that provides the basis for the court's sentence. Because we cannot be certain which of the three counts the trial court would select as the operative charge, we remand to the trial court for identification of the single count of which Murphy was convicted, dismissal of the remaining two counts, and entry of a final sentence on the merged charge.

The entry is:

> Judgment vacated. Remanded to the Superior Court for entry of a judgment of conviction of a single consolidated charge and sentence on the single consolidated charge.

**On the briefs:**

Scott F. Hess, Esq., Law Office of Scott F. Hess, LLC, Augusta, for appellant Mark Murphy

Maeghan Maloney, District Attorney, and Fernand LaRochelle, Dep. Dist. Atty., Kennebec County District Attorney, Augusta, for appellee State of Maine

**At oral argument:**

Scott F. Hess, Esq., for appellant Mark Murphy

Maeghan Maloney, District Attorney, for appellee State of Maine

Kennebec County Superior Court docket number CR-2013-247
FOR CLERK REFERENCE ONLY