STATE OF MAINE
KENNEBEC, ss

SUPERIOR COURT
KENCD-CR-17-2546 and
KENCD-CR-17-2547 ✓

STATE OF MAINE

v.

DANIELLE JONES

          **COMBINED ORDER ON MOTIONS TO SUPPRESS BROUGHT BY DANIELLE JONES AND BRANDON ROSS**

STATE OF MAINE

v.

BRANDON ROSS

Before the Court are two motions to suppress evidence obtained as a result of the execution of four search warrants against Danielle Ross and Brandon Ross. They are both charged with Class D Failure to Comply with Court Order. Their cases have not been joined for trial but a combined hearing on the Motions to Suppress brought in the above-captioned cases took place on December 3, 2018. The State is represented by Assistant District Attorney Tracey McCarthy. Danielle Ross is represented by Attorney Darrick Banda and Brandon Ross is represented by Attorney Scott Hess.

The Court has reviewed the four search warrants at issue in this case, has considered the parties' written filings, and for reasons stated denies the motions to suppress with respect to three of the search warrants, and grants the motions with respect to one.

1

The Court conducted a four-corners analysis of the four warrants at issue, as no issues were raised under *Franks v. Delaware*, 438 U.S. 154 (1978).

In *State v. Simmons*, the Law Court held that a finding of probable cause rests on "a practical, commonsense determination whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place." 2016 ME 103, ¶ 11, 143 A.3d 819 (quoting *State v. Johndro*, 2013 ME 106, ¶ 9, 82 A.3d 820). The affidavit filed in support of the warrant request "must set forth some nexus between the evidence to be seized and the locations to be searched." *State v. Gurney*, 2012 ME 14, ¶ 33, 36 A.3d 893 (quoting *State v. Samson*, 2007 ME 33, ¶ 15, 916 A.2d 977). A nexus "may be inferred from the type of crime [and] the nature of the items sought[.]" *Id.* (quoting *id.*). In addition, courts reviewing search warrants must "do so . . . in a positive light" and "allowing for reasonable inferences that may be drawn to support the magistrate's determination[.]" *Simmons*, 2016 ME 103, ¶ 12, 143 A.3d 819 (quoting *Johndro,* 2013 ME 106, ¶ 9, 82 A.3d 820). The Court will address each of the four search warrants applying these standards.

*Search Warrant Issued October 30, 2017*

This search warrant sought authorization to search the person of both Defendants, their residence, place of business, and vehicles. It sought to seize any electronic devices along with passcodes and chargers, and to be able to make duplicate images of any electronic data stored on the devices.

The affiant, Detective Kyle McDonald of the Waterville Police Department, disclosed the following information to the judge who authorized this warrant. The Waterville Humane Society, which was housing and caring for two pit bulls who were subject to a euthanasia order issued by

the Waterville District Court, reported on the night of October 24, 2017 that the dogs had come free of their restraints when they were being walked by their owner, Danielle Jones. The euthanasia order had been appealed to the Law Court which issued a decision that same day upholding the District Court order. At approximately 1240 hours the Animal Control Officer (ACO) for Winslow was notified by Winslow PD about the Law Court's decision and the ACO advised he would notify the Humane Society. At approximately 1302 the Humane Society requested "paperwork" regarding the Law Court decision which was faxed to the Humane Society at approximately 1517 hours. At approximately 1844 hours, Winslow PD received a call that the dogs had been being walked by a volunteer but were now at large. Just prior to that call, at approximately 1806, Humane Society Director Lisa Smith texted the ACO to notify him as well. Ms. Smith told the ACO that she left a message on the phone of the person walking the dogs in hopes that they had a "lapse in judgment" and would return them. Ms. Smith said that staff at the shelter had conducted a search for the dogs but could not find them. Ms. Smith clarified for the ACO that the volunteer was actually the owner, Danielle Jones.

Ms. Smith informed the ACO that Ms. Jones and her boyfriend, Brandon Ross, had been coming to the shelter every week to walk the dogs but that today Ms. Jones was by herself that day because Mr. Ross had a medical appointment. She told the ACO she was skeptical about Ms. Jones's story as to how both dogs could come out of their chest harnesses at the same time, and on their own.

The next day, Det. McDonald went to the residence where Ms. Jones and Mr. Ross live in Winslow. A dog was inside barking, and two vehicles, registered to the Defendants, were in the driveway. He then went to Ms. Jones's place of business (The Muddy Paw) and there was a note on the front door that stated the store was closed until the next day.

3

Staff at the shelter were interviewed, including Ms. Smith, that same day. Ms. Smith told Det. McDonald that Ms. Jones and Mr. Ross were allowed to walk the dogs twice a week but had been told to keep the walks confined to the property. This had been the practice for almost a year since the dogs were housed there. She said when her staff informed her the day before that the dogs were at large she drove to the shelter to confront Ms. Jones as she found the story "suspicious." She noted that Mr. Ross was always with Ms. Jones, and that she believed it likely that Ms. Jones had learned about the Law Court ruling before she arrived at the shelter to walk the dogs. She had texted Ms. Jones about her suspicions but Ms. Jones responded by text denying that she had the dogs.

Det. McDonald also interviewed Christopher Corson, who works at the shelter and came in to assist in the search for the dogs. He searched for almost two hours but found no tracks where he was told the dogs had entered the woods, and remarked that if the dogs had harnesses they would likely have "got hung up" on trees in the woods. He saw other animal tracks but no sign the dogs had been in the woods. Det. McDonald also spoke with Thomas Gamache who stated that when he came inside the shelter after hearing that the dogs were at large, thirty seconds later he took the call from the ACO informing him about the Law Court decision. Mr. Gamache also said that when he saw Ms. Jones walking the dogs that they did not seem to be pulling that hard.

Det. McDonald interviewed Stacey Recanati who told him that she had observed Ms. Jones walking the dogs in the woods near the Webb Road. She stated that Ms. Jones told her that one of the dogs' harnesses was on upside down, a truck went by and spooked the dogs and they both ran off. Ms. Recanati drove in van with Ms. Jones for four hours looking for the dogs with no success. Ms. Recanati told Det. McDonald that she was aware during this time how the Law Court had ruled, and asked Ms. Jones if she had heard from her attorney. Ms. Jones indicated she

4

had not. She told Ms. Jones she should call her lawyer and that Ms. Jones made a call in the van and told her that the call was to her lawyer. She left a voicemail, and a few minutes later someone called Ms. Jones and she heard her ask the person if they had heard anything about the case. Ms. Jones reported that he lawyers had not heard anything about the case. Ms. Recanati then told Ms. Jones about the Law Court decision and Ms. Recanati said Ms. Jones became hysterical. They then ran into Mr. Ross at approximately 3 pm at the driveway to the shelter who stated he had been looking for the dogs. A few minutes later Mr. Ross called Ms. Jones and she reported to Ms. Recanati that Mr. Ross told her he was going to stop looking for the dogs and he would rather they get hit by a car than euthanized. Ms. Recanati told Det. McDonald that she had seen Ms. Jones come to the shelter by herself before but that when she did she only walked one dog at a time.

Melissa Dawes also gave a statement stating that Ms. Jones came to walk the dogs at approximately noon or 12:30. She said that Ms. Jones said she should be fine with the dogs since they were both leashed and harnessed. After approximately twenty minutes she returned without the dogs or their harnesses or leashes. They began looking for the dogs for approximately five minutes when Danielle began calling Mr. Ross on her phone. Ms. Dawes began searching on her own and Ms. Jones started searching with Ms. Recanati.

Det. McDonald returned to the Defendants' residence just before 5 pm, and again heard a dog barking inside the residence, and observed the cars belonging to the Defendants in the driveway. Approximately twenty-six minutes later he observed the Defendants exit a black GMC Yukon that pulled into their driveway. The Defendants looked directly at Det. McDonald and entered the residence, but refused to answer the door. Eventually Ms. Jones opened the door and gave him a piece of paper with the name and phone number of her attorney.

Viewing this evidence in a "positive light" the Court concludes that the information disclosed by Det. McDonald established a fair probability that evidence of the crime of keeping a dangerous dog or neglecting a court order would be found on the devices to be seized. The Court can reasonably infer that both Defendants were, based on their conduct and statements, highly motivated to prevent their dogs from being euthanized. They were clearly emotionally attached to the dogs and went to great length and expense to engage in litigation to keep them from being euthanized. The conduct of Ms. Jones on the day in question was a departure from her usual practice of walking the dogs with Mr. Ross. It was reasonable for law enforcement to view skeptically her story about both dogs simultaneously coming free from their harnesses and leashes, then running into woods without leaving any trace or track. Ms. Jones was the last person to be seen with the dogs and Mr. Ross said he would prefer to see them run at large, and even be killed by a vehicle, than be euthanized. If the dogs ran into the woods wearing their harnesses and leashes it could be reasonably inferred that they would be "hung up" on trees or rocks or other obstacles, as one witness suggested, or that they would be quite visible on the road running in that condition.

The affidavit further provides the nexus between the evidence to be seized and the places to be searched. There is direct evidence that Ms. Jones used her phone during and/or just after the events described, and the Court infers that Mr. Ross arrived at the Humane Society in response to a call from Ms. Jones. The Court concludes that there was a fair probability that evidence of communications contemporaneous with these events, and between the Defendants and between the Defendants and other persons, would be located within the devices sought. With respect to the other places to be searched—their residence, their vehicles, their place of business, and their persons—the Court infers from the Defendants' statements and behavior that all of these locations are exactly where it would reasonable be expected to locate devices belonging to the Defendants.

6

The Court will therefore deny the motion to suppress with respect to the first search warrant issued October 30, 2017.

<u>*Search Warrant Issued November 2, 2017 for Verizon Records*</u>

The information contained within the affidavit in support of this search warrant is virtually identical to the information reviewed with respect to the first. This warrant sought authorization to search the following: cell phone records of both Defendants; location information for the cell phones of both Defendants; text messages for both; photo messages for both; billing information; and any document, files or media currently in the possession of Verizon in reference to the phone numbers of the Defendants. All of this information was limited to a particular time frame, specifically from September 25, 2017 through October 31, 2017.

For the reasons stated above, the Court finds that there is a fair probability that evidence of the crime of neglecting a Court order would be found within the content of the devices seized pursuant to the first search warrant. While the first warrant permitted law enforcement to seize the devices, it did not authorize the search of the devices. *See Carpenter v. United States*, 585 U.S. ___, 138 S.Ct. 2206 (2018); *Riley v. California*, 573 U.S. __, 134 S.Ct. 2473 (2014).

The Defendants' primary challenge to this second warrant seems to focus on what they characterize as the "random" selection of the time period limitation, namely September 25, 2017 through October 31, 2017. The cases cited by the Defendants, however, are cases where the affidavit provided no time frame or limitation at all, *United States v. Lazar*, 604 F. 3d 230, 238 (6th Cir. 2010); *United States v. Ford*, 184 F. 3d 566, 576 (6th Cir. 1999). By contrast, this warrant is time-limited to records that coincide with the typical length of a monthly billing cycle. In other words, not only was the warrant time-limited, it simply required seizure of records during the

approximate thirty-day period just prior to the events in question. The Defendants' "overbreadth" argument, given this very limited time period, is unpersuasive, and the Court will therefore deny the motions as to the second warrant.

### *Search Warrant Issued November 2, 2017 for Facebook Records*

This warrant requests Facebook information pertaining to both Defendants and it seeks to obtain this information directly from Facebook. The time period requested is for four months prior to the events in question, from July 1, 2017 to November 2, 2017. The Defendants challenge the selection of this time period, as well as the scope of the information requested from Facebook. Again, virtually the same information disclosed in Det. McDonald's affidavit is set out in this affidavit, and for reasons stated above, that information is sufficient to establish a fair probability that the crime of neglecting a Court order would be found in the Facebook information of both Defendants. However, because the Court agrees with the defense that the categories of information requested from the Defendants' Facebook are overbroad, the Court will grant the motion to suppress with respect to the third warrant.

As counsel for the Defendants point out, the third warrant requests an astonishing quantity of information from Facebook for both Defendants. The affidavit in support of the warrant only minimally tries to justify the scope of the request. It simply states that Det. McDonald "firmly believes" that evidence of the crime at issue would be found within the 60 categories of Facebook data set forth in the warrant. Categories for which there is no basis asserted to justify seizure of the content include, but are not limited to: "apps" added to the account (#9); deleted "friends" from the account (#14); "friends" that might be family members (#17); the "favorite quotes" section of the accounts (#18); all "followers" of their accounts (#19); all people that the Defendants "follow"

8

(#20); all pending sent and received "friend" requests (#21); a list of all "friends" associated with the accounts (#22); any groups that the Defendants say they belong to (#24); any post or photo that the account has "liked" (#29); "likes" made by others to the accounts' postings (#30); "likes" that the Defendants have made "on sites off of Facebook" (#31); as well as any information added to the "political views" section in the account timeline (#45).

It appears that the affidavit just listed every single category of content that a Facebook user may have access to, but it utterly fails to articulate any reasonable or relevant justification for these extremely broad requests. The Court agrees with the Defendants that this affidavit amounts to the kind of "wide-ranging exploratory searches the Framers intended to prohibit." *U.S. v. Griffith*, 867 F. 3d 1265, 1275 (D.C. Cir. 2017) (quotation omitted). Or, as the court stated in *United States v. Winn*, 79 F. Supp. 3d 904, 920 (S.D. Ill. 2015), the Constitution requires that the affiant "explain . . . how and why each type of data" is connected to criminal activity.

Because the scope of this third warrant is constitutionally overbroad, the Court will grant the Defendants' motions to suppress the evidence obtained directly from Facebook.

*Search Warrant Issued December 5, 2017*

The fourth search warrant seeks authorization to search devices seized pursuant to the first, including two i-Phones, one i-Pad, one i-Pad mini, an Acer laptop computer, an Apple MacBook, and a Swann Security System. In his affidavit, Det. McDonald also requests that law enforcement be able to seize cell phone and digital transmitting device records, names and phone numbers, contact information, and content information within the phones including text messages, emails, Facebook messages, voicemail messages, and videos contained on the electronic devices seized.

The Defendants argue that the Court should review the assertions in the affidavit, and conduct a "fruit of the poisonous tree" analysis as this affidavit contains information "illegally obtained" from the three previous search warrants. However, because the Court has found only one of the warrants to be constitutionally defective, namely the warrant authorizing seizure of information directly from Facebook, the Court will deny the motion to suppress with respect to this fourth search warrant. The Court has reviewed Det. McDonald's affidavit, and can find no reference to the information obtained directly from Facebook. The relevant portions for the Court's analysis are paragraphs 41 through 52, and the Court could find nothing to suggest that the magistrate who approved the warrant was ever presented with evidence or content information seized from Facebook. To be sure, the magistrate was presented with location and content information seized from Verizon, and together with observations made of the Defendants by the officers who executed the first search warrant, this information is more than sufficient to establish a fair probability that evidence of a crime would be found within the devices sought to be seized.

It is evident to the Court that the magistrate reviewing this affidavit did not rely upon any of the information seized directly from Facebook and the Court has no basis to exclude the evidence obtained as a result of the execution of this fourth warrant. The Court will therefore deny the motion to suppress the information seized pursuant to the execution of the fourth warrant.

The entry will be: The Motions to Suppress brought by Danielle Jones and Brandon Ross are denied with respect to warrants issued October 31, 2017, November 2, 2017 (Verizon records) and December 5, 2017. The Motions to Suppress are granted with respect to the warrant issued November 2, 2017 which was directed to Facebook.

_____
**DATE**

_____
**SUPERIOR COURT JUSTICE**

11