MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2017 ME 104
Docket:        Aro-16-351
Argued:        April 13, 2017
Decided:       May 25, 2017

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE

v.

JESSE P. MARQUIS

MEAD, J.

[¶1]  Jesse P. Marquis appeals from a judgment of conviction of murder, 17-A M.R.S. § 201(1)(A) (2016), entered by the trial court (Aroostook County, *Hunter, J.*) following a jury trial.  Marquis contends that the court erred by admitting in evidence text messages found in the victim's cell phone and three photographs of the crime scene in which the victim's body was visible, and by giving the jury an allegedly confusing and legally-flawed self-defense instruction.  We disagree and affirm the judgment.[1]

---

[1]  Marquis also contends that the court abused its discretion in allowing a law enforcement officer to testify briefly concerning the capabilities of the bloodhound that located him in the woods at the time he was arrested.  We discern no error and do not discuss that issue further.

## I. FACTS AND PROCEDURE

[¶2] "Viewing the evidence in the light most favorable to the jury's verdict, the trial record supports the following facts." *State v. Weaver*, 2016 ME 12, ¶ 2, 130 A.3d 972. On May 30, 2014, the victim had been in a relationship with Jesse Marquis for nearly two years; Marquis was living with her at her house. That evening, the victim went with her sister and two friends to a camp in St. Francis where Marquis was present with his young son to retrieve her car from Marquis and end the relationship. During a car ride with the two friends earlier that afternoon, the victim told them that Marquis "was being a baby," and that she had "had enough of his childish acts," as he sent her text messages from 6:24 p.m. to 8:05 p.m. saying that he loved her and pleading for her to come to the camp and spend time with him.

[¶3] Arriving at the camp as it was getting dark, the victim and her sister got out of their vehicle and the victim talked to Marquis. Marquis was "fidgeting" and "was obviously drinking." The victim asked for her car keys and Marquis gave them to her; Marquis then asked for money and the victim gave him some. After Marquis retrieved clothing and beer from the car, the victim's sister told Marquis to "stay away from the house and stay away from my sister." The victim's friend saw Marquis run up to the car and "almost jump[] . . . on the

side" as the victim prepared to leave. The victim, her sister, and her friends returned to the victim's house. Texts from Marquis found on the victim's phone sent at 8:50 p.m. and 8:51 p.m., forty-five minutes after the earlier texts, said "I never hit you or never was aggressive to you," and "I want my gun." Although they had planned to return to their residence in Fort Kent, the victim's friends decided to spend the night with her; one slept on the couch, and the other in a recliner.

[¶4] Marquis's ex-wife had dropped their son off with Marquis at 5:00 p.m. that day for his regular weekend visitation. Between 8:00 and 8:30 p.m., Marquis sent her a text message telling her to come get the boy. When she responded that she was at work and would have to find a replacement to take the remainder of her shift, Marquis sent another message, twenty to thirty minutes after the first, telling her to "[c]ome get [the boy] now." Assuming that her son was at the victim's house, she went there, only to find that the victim and the victim's two friends were there, but Marquis and her son were not. Because she did not know where the camp was, the victim and her friends accompanied her back to the camp in a separate vehicle in order to retrieve her son.

4

[¶5]  At close to 9:00 p.m., Marquis's ex-wife knocked on the door of the camp and Marquis answered; their son was there as well.  When she said that she was there to pick up the boy, Marquis "stumbl[ed] back in" to the camp trying to find the boy's belongings.  Marquis was "intoxicated" and "upset"; when the boy and his mother left, Marquis was on the floor of the camp crying. Because she had been informed about the status of the victim's relationship with Marquis, Marquis's ex-wife returned to the victim's house to gather her son's things that were there.  While she was on the way, Marquis texted her, saying, "I want to be with you and [the boy], I'm tired of being out in the cold"; she did not respond.  She had a friendly conversation with the victim and never saw her again.  Between 9:00 and 9:30 p.m., Marquis texted his ex-wife to say that he wanted his son back that night; she responded, "no."

[¶6]  At 9:32 p.m., Marquis resumed sending text messages to the victim, asking what he had done wrong; saying "I fed you, made your life easy," and "you told me all week you loved me"; asking her to come get him; and saying, "I had plans for us."  The last message, "Come get me," was sent at 11:23 p.m.

[¶7]  At daybreak on May 31, the victim's friend who was sleeping in the recliner woke to see the victim moving around in the house; he then dozed back off.  When he again awoke, he saw Marquis running into the living room with a

knife in his hand. As he tried to get out of the chair, he told Marquis to leave and Marquis swung the knife at him. While he and the friend who had been sleeping on the couch called 9-1-1, he heard yelling and the victim screaming, and "something like a smash" coming from the bedroom; Marquis then emerged from the bedroom carrying a rifle. As Marquis left the house, he was fumbling with the rifle in an apparent attempt to reload it. When the friend went into the bedroom with its adjoining bathroom, he saw the victim lying on the floor with "blood everywhere."

[¶8] The victim's friend who had been sleeping on the couch woke to "a big thud and a scream." She went into the bedroom and saw the victim on the floor, with Marquis "holding her but hitting her at the same time"; she also saw a gun. At about 5:45 a.m., as she made the call to 9-1-1, she saw Marquis holding the gun. Marquis followed her into the kitchen and pointed the gun at her, then left the house. She went to the victim and performed CPR on her until a paramedic arrived some twenty minutes later. The paramedic found the victim dead in a large pool of blood with her friend still attempting to resuscitate her.

[¶9] The Deputy Chief Medical Examiner performed an autopsy. She determined that the victim died from a contact gunshot wound to the chest consistent with high-velocity hunting rifle ammunition, as well as stab wounds

6

to the chest. The victim had suffered numerous stab and cut wounds, including a stab wound to the top of her head in which the medical examiner found embedded in her skull a piece of metal consistent with a knifepoint. The victim had cuts on her fingers that were typical of defensive wounds. During the autopsy, the medical examiner recovered a deformed bullet fragment from the victim's clothing that had fallen out of the exit wound.

[¶10] On June 6, 2014, following an extensive manhunt, Marquis was arrested in the woods near St. Francis after being tracked by a bloodhound brought in from New Hampshire; he had cuts on his hand and a rifle was lying on the ground next to him. A forensic specialist with the Maine State Police testified that a spent 30-06 cartridge found on the floor in the victim's bedroom was fired from Marquis's rifle, and that the bullet fragment found during the autopsy had the same general rifling characteristics as test rounds fired from Marquis's rifle and therefore could have come from that weapon, although the specialist could not say definitively that it did. Other forensic evidence established that blood on a knife found in the victim's bedroom was hers; the knifepoint found during the autopsy came from that knife; blood found in an open rifle case that was partially under the victim's bed was Marquis's; and a

boot print in the bedroom that was developed by using a chemical that reacts with blood was made by a boot Marquis was wearing when he was arrested.

[¶11]  On July 11, 2014, the Aroostook County Grand Jury indicted Marquis for intentional or knowing murder with the use of a firearm, 17-A M.R.S. §§ 201(1)(A), 1158-A(1)(B) (2016).  Counsel was appointed and Marquis entered a plea of not guilty.  Prior to trial, Marquis moved in limine to exclude, pursuant to M.R. Evid. 403, any photographs the State might seek to admit that would "inflame the passions of the jury."  He also moved to exclude, pursuant to M.R. Evid. 401, evidence of the text messages that the State contended Marquis sent to the victim the night before she was killed on the ground that they were irrelevant. Concerning the text messages, the court ruled that they were relevant to prove Marquis's state of mind, and were therefore admissible subject to the State laying a proper foundation at trial.

[¶12]  A jury trial was held on June 14-17, 2016.  During the trial the court admitted the text messages over Marquis's objection, and also admitted three crime scene photographs in which the victim's body could be seen, two over Marquis's objection and one without objection.  The jury returned a verdict of guilty.  At the sentencing hearing, the court entered judgment and imposed a life sentence.  Marquis appealed the judgment of conviction and filed an

8

application to allow an appeal of sentence. By order dated October 20, 2016, the Sentence Review Panel denied leave to appeal from the sentence.

## II. DISCUSSION

### A. Text Messages

[¶13] Marquis first asserts that the court erred in admitting the text messages found in the victim's phone because they were irrelevant, and because there was an insufficient foundation supporting their admission. Our standard of review is multifaceted:

> When . . . a party has preserved an objection to the admissibility of evidence, we review the court's determination of relevance for clear error and . . . the admission of evidence over an objection for lack of foundation for an abuse of discretion, but review underlying factual findings for clear error. A trial court commits clear error on evidence questions when its findings regarding the foundation for admitting or excluding evidence are not supported by facts in the record.

*State v. Gurney*, 2012 ME 14, ¶ 36, 36 A.3d 893 (citations and quotation marks omitted).

#### 1. Relevance

[¶14] Marquis contends that text messages exchanged with the victim less than twelve hours before her murder were "not temporally relevant to the events of her death." Maine Rule of Evidence 401 provides that evidence is relevant if it makes a material fact "more or less probable." The indictment

charged that Marquis intentionally or knowingly caused the victim's death. As the court found, text messages suggesting that Marquis was distraught and upset with the victim concerning their relationship on the evening of May 30, 2014, made it more probable that he acted intentionally or knowingly only a few hours later. Accordingly, the texts were relevant. *See Gurney*, 2012 ME 14, ¶ 40, 36 A.3d 893 (concluding that evidence was properly admitted "as a piece of circumstantial evidence concerning [the defendant's] state of mind").

### 2. Foundation

[¶15] Maine Rule of Evidence 901(a) required the State, as the party offering the text messages, to "produce evidence sufficient to support a finding" that Marquis was the person who sent them. Over Marquis's objection, the court ruled that the State had met that burden, finding that "there is a rational basis upon which the jury could conclude these text messages came from [the victim's] phone and they are what the State contends . . . . [U]ltimately, it's for the jury to decide whether they are what's been represented."

[¶16] There was ample evidence to support the court's finding that the State had satisfied Rule 901's threshold requirement. *See State v. Thompson*, 503 A.2d 689, 691 (Me. 1986) (referring to "the threshold requirement for

admissibility under M.R. Evid. 901(a)"). First, the phone containing the messages was identified at trial as belonging to the victim. Second, the victim's phone labeled the incoming messages with a header of "Jesse M," and Marquis's ex-wife, although she did not remember Marquis's entire phone number, recalled several digits that matched the contact information in the victim's phone. Finally, events described in the messages very closely corresponded to events testified to by witnesses: twice the sender texted that he was at "Benny camp";[2] the victim sent a message saying that "[C.] is coming to get [A.] . . . u must have called her";[3] and the sender later texted, after the victim had retrieved her car at the camp, "I need a ride back home."

[¶17] From that evidence the jury could rationally conclude that it was Marquis who sent the text messages found in the victim's phone. Accordingly, the court did not clearly err or abuse its discretion in admitting the messages over Marquis's lack of foundation objection. *See Gurney*, 2012 ME 14, ¶ 36, 36 A.3d 893.

---

[2] A witness whose first name is Benny testified that on the evening of May 30, 2014, Marquis and his son were at his camp in St. Francis.

[3] Although we do not do so here, the message used the names of Marquis's ex-wife and son.

B.      Self-Defense Instruction

[¶18]   In its charge to the jury, the court gave a lengthy instruction concerning self-defense and imperfect self-defense.  Marquis did not object to the instruction, and did not offer any clarifications or corrections even though the court invited him to do so twice: immediately after the instruction was given and again before the jury retired to deliberate.  Accordingly, his contention that the self-defense instruction (1) was "erroneous and confusing and, as such, deprived Mr. Marquis of a fair trial," and (2) contained the structural problem that we identified in *State v. Baker*, is reviewed only for obvious error, "which occurs in this context when jury instructions, viewed as a whole, are affected by highly prejudicial error tending to produce manifest injustice."  *State v. Baker*, 2015 ME 39, ¶ 11, 114 A.3d 214 (quotation marks omitted); *see Weaver*, 2016 ME 12, ¶ 11, 130 A.3d 972.

[¶19]   Concerning Marquis's first assertion, that the court's instruction was "convoluted, confusing and hard to follow," the instruction was complex, but a complex instruction is not per se an erroneous one, particularly when it concerns a multi-part legal analysis such as that required here, where the jury was asked to first consider the charge of murder and the lesser-included crime

12

of manslaughter, followed by the statutory justifications of self-defense[4] and imperfect self-defense.[5] *See* Alexander, *Maine Jury Instruction Manual* § 6-61 at 6-121 to 6-122 (2016 ed.) (setting out a sample instruction on self-defense using deadly force and imperfect self-defense). Here, reviewing the instructions as a whole, *see State v. Hanscom*, 2016 ME 184, ¶ 10, 152 A.3d 632, we conclude that the court "informed the jury correctly and fairly in all necessary respects of the governing law," *id.* (quotation marks omitted), and thus we discern no error.

[¶20] Concerning Marquis's second contention, that the instructions contained a fatal structural flaw, the instructions were given in two parts. In the first part, the court explained the elements of the crime of murder, and told the jury that

> [i]f you find that the State has proven [the elements] beyond a reasonable doubt, then you must find that the defendant is guilty of murder as alleged in the indictment. If you conclude that the State has failed to prove beyond a reasonable doubt any of [the elements], then you must find the defendant not guilty of murder.

---

[4] 17-A M.R.S. § 108 (2016).

[5] 17-A M.R.S. § 101(3) (2016).

The court then instructed the jury on the lesser-included charge of manslaughter,[6] concluding with a similar directive.

[¶21]   Viewed in isolation, because the statutory justification of self-defense was at issue in the case,[7] the initial instructions regarding the charge of murder and the lesser-included crime of manslaughter were incorrect "[b]ecause the roadmap of the jury's analytical path described in the court's charge authorized the jury to find the defendant guilty without any consideration of self-defense." *Baker*, 2015 ME 39, ¶ 14, 114 A.3d 214.  We do not view the instructions in isolation, however.  *See id.* ¶ 10 ("We review jury instructions as a whole . . . ." (quotation marks omitted)).

[¶22]  Immediately following its instruction on the crimes of murder and manslaughter, the court turned to the second part of the instructions at issue, telling the jury that

> [u]pon the basis of my instructions provided to you up to this point, if you are to determine that Mr. Marquis had committed either intentional or knowing murder or reckless or criminally negligent manslaughter, you must next consider the law relating to self-defense.

---

[6]  17-A M.R.S. § 203 (2016).

[7]  In his closing argument, Marquis pointed to a wound on his hand, his blood in the rifle case, and the absence of any eyewitness testimony concerning what occurred when he and the victim were in the bedroom as evidence consistent with an act of self-defense.

14

The court stressed that

> [a]t the very outset, I must emphasize . . . relative to self-defense . . . Mr. Marquis does not have the burden of proving that he acted in self-defense. Instead, the State has the burden of proving beyond a reasonable doubt that the intentional or knowing murder or the reckless or criminally negligent manslaughter was not done in self-defense.

The court then concluded its thorough instructions on self-defense and imperfect self-defense by very clearly telling the jury what it must do in the event that the State failed to meet its burden:

> If . . . the State has failed to meet its burden of proving beyond a reasonable doubt the absence of self-defense . . . you must find Mr. Marquis not guilty of all charges, even if you had earlier determined that Mr. Marquis had committed either intentional or knowing murder or reckless or criminally negligent manslaughter.

[¶23] Contrary to Marquis's contention, our decision in *Baker* does not compel a conclusion that the court's instructions deprived him of a fair trial. In that case, we identified "two structural flaws that, *taken together*, rise to the level of obvious error." *Id.* ¶ 13 (emphasis added); *see Weaver*, 2016 ME 12, ¶ 12, 130 A.3d 972 ("In *Baker* . . . we concluded that a defendant had met [the] high burden [of showing obvious error] based on the *combined effect* of two structural flaws." (emphasis added) (quotation marks omitted)). The first was that the trial court's instructions concerning the elements of the crime ended, as in this case, with a directive that the jury should find the defendant guilty if

the State had proved the elements beyond a reasonable doubt, "suggest[ing] that the jury could bypass [the] issue" of self-defense. *Baker*, 2015 ME 39, ¶¶ 4, 14, 114 A.3d 214. It is that "structural flaw[]" that Marquis points to here. *Id.* ¶ 13.

[¶24] The second structural problem identified in *Baker*, which Marquis acknowledges is not present in this case, was a critical one, namely that "the court [in *Baker*] did not instruct the jury that it was required to acquit [the defendant] if the State failed to meet its burden of proof on [the] issue [of self-defense]," and thus the court "fail[ed] to state that self defense is, in fact, a defense." *Id.* ¶¶ 16-17 (quotation marks omitted). As a result, "the jury was left without guidance about the exculpatory consequences of the State's failure to prove that [the defendant's] conduct was not justified. . . . [The court's] instructions . . . fell short of informing the jury of its duty to acquit [the defendant] if it found that the State had not disproved [his] contention that he acted in self-defense." *Id.* ¶ 22.

[¶25] Here, "[u]nlike the court in *Baker*, the court . . . made clear that even if the jury found that the State had proved the elements of [murder or manslaughter], the jury still could not find [Marquis] guilty without first resolving the issue of self-defense." *Weaver*, 2016 ME 12, ¶ 13, 130 A.3d 972.

In *Weaver*, we concluded that the court's instructions did not rise to the level of obvious error even though the court "did not explicitly instruct the jury that it was required to find [the defendant] not guilty if it found that the State had not disproved his self-defense theory beyond a reasonable doubt." *Id.* In this case, the court *did* explicitly tell the jury that if it determined that "the State has failed to meet its burden of proving beyond a reasonable doubt the absence of self-defense . . . you must find Mr. Marquis not guilty of all charges."

[¶26]  We therefore conclude, as we did in *Weaver*, that "[v]iewed as a whole, in contrast to those in *Baker*, the court's instructions here were internally consistent and legally accurate." *Id.*

C.    Photographs

[¶27]  Finally, Marquis contends that the court's admission in evidence of three color crime scene photographs was error because their prejudicial effect outweighed their probative value. *See* M.R. Evid. 403. Two of the photographs—State's Exhibit #22, a full-body photograph of the victim lying in a large amount of blood; and State's Exhibit #27, a photograph centered on the victim's bedroom in which her body from the waist up is visible on the bathroom floor in the background—were admitted over Marquis's objection. Marquis did not object to the admission of State's Exhibit #24, a photograph

centered on blood spatter on the wall behind the victim, in which her head is visible in the foreground. Accordingly, we review the admission of Exhibits #22 and #27 for an abuse of discretion, and the admission of Exhibit #24 for obvious error. *State v. Allen*, 2006 ME 21, ¶ 9 n.3, 892 A.2d 456.

[¶28] At trial, Marquis argued, "I think the State's entitled to some leeway. It strikes me that between . . . State's 27 and State's 24, the State has what it needs. And then State's . . . 22 is simply highly inflammatory." The State argued that Exhibit #27 was offered to "show the condition of the bedroom . . . and the gun case . . . and the position of that and also the red-brown stain on the floor. . . . [T]he fact she's in the picture is just the fact she's there." The court, noting that evidence had been admitted concerning the gun case and the "explosive force of these high-velocity rounds" that would produce blood spatter, ruled that, "clearly, 22 I think is admissible and the State's entitled to present that . . . I'm going to allow admission of all three photographs."

[¶29] We have said that

photographs are admissible if they are (1) accurate depictions; (2) relevant; and (3) if their probative value is not outweighed by any tendency toward unfair prejudice.

. . . .

The third determination . . . is a Rule 403 inquiry: whether the "probative value is substantially outweighed by the danger of

unfair prejudice." M.R. Evid. 403. To sustain a Rule 403 objection, the prejudice must be more than simply damage to the opponent's cause. It must be evidence that has an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.

*Id.* ¶¶ 10, 13 (citation and quotation marks omitted).

[¶30] We have no difficulty in concluding that on this record the court could find that the three photographs were accurate depictions of the victim and the scene, and that they were relevant to the State's case-in-chief; Marquis's real contention is that the danger of unfair prejudice that they posed substantially outweighed their probative value. We disagree.

[¶31] In *Allen*, we discussed the photographs that were at issue in *State v. Crocker*, 435 A.2d 58 (Me. 1981), which was the case that gave rise to the three-part test; the discussion is equally applicable here:

> [T]he photographs [in *Crocker*] were not merely cumulative of the medical testimony because they conveyed relevant information to the jury in a much more complete and meaningful form than could the almost clinical words of the [medical experts]. Although the photographs could be considered "gruesome," that fact did not make them inadmissible, because the salient issue was whether their probative value was *substantially* outweighed by the danger of *unfair* prejudice.

*Allen*, 2006 ME 21, ¶ 10, 892 A.2d 456 (quotation marks omitted). Here, although the photographs are disturbing, they are not overly or unnecessarily gruesome given the nature of the case. Furthermore, as in *Allen*, the jury was

already well aware of the extensive injuries that the victim suffered because it had heard the testimony of the medical examiner; accordingly, "[b]ecause these facts were already before the jury, the depiction in the full-body photograph . . . would not have unduly caused the jury to decide the case on an emotional or other improper basis." *Id.* ¶ 15.

[¶32]  We conclude that the trial court did not obviously err or abuse its discretion in admitting the three photographs, one primarily showing the deceased victim—a central element of the murder charge that the State was required to prove—and the others primarily depicting relevant evidence in the case.

The entry is:

Judgment affirmed.

---

Jeremy Pratt, Esq. (orally), and Ellen Simmons, Esq., Camden, for appellant Jesse P. Marquis

Janet T. Mills, Attorney General, and Lara M. Nomani, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Aroostook County Superior Court docket number CR-2014-261