MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:    2025 ME 40
Docket:      Wal-24-181; SRP-24-182
Argued:      December 12, 2024
Decided:     May 1, 2025

Panel:       STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

## STATE OF MAINE

v.

## MATTHEW W. PENDLETON

HORTON, J.

[¶1] Matthew W. Pendleton appeals from a judgment of conviction for manslaughter (Class A), 17-A M.R.S. § 203(1)(A) (2024), entered by the trial court (Waldo County, *R. Murray, J.*) after a jury trial, and from the court's imposition of sentence. On appeal, Pendleton challenges (A) the court's admission of screenshots of text messages that he sent to his daughter around the time of the victim's death, (B) the admission of his daughter's testimony about his alcohol use and their family dynamic, (C) the court's rulings allowing a jailhouse informant to testify and denying Pendleton's motion for mistrial after the informant revealed in his testimony that Pendleton and he had met in jail, and (D) the court's refusal to consider in its sentencing analysis a juror's affidavit purporting to describe the jury's view of the evidence and the

reasoning underlying the jury's verdict. We affirm the judgment of conviction and the sentence.

## I. BACKGROUND

### A. Facts

[¶2] Viewing the evidence in the light most favorable to the State, the jury rationally could have found the following facts beyond a reasonable doubt. *See State v. Brown*, 2017 ME 59, ¶¶ 7-8, 158 A.3d 501.

[¶3] Pendleton and Kevin Curit were friends from childhood. In the summer of 2022, Curit moved into Pendleton's home because he needed a place to stay and Pendleton's wife and children had moved out.

[¶4] On the afternoon of January 5, 2023, Pendleton bought several bottles of alcohol and brought them home. Pendleton at times became mean or angry when intoxicated from consuming alcohol and sometimes sent incoherent text messages when intoxicated. At around 11:00 p.m. on the night of January 5, Pendleton sent multiple text messages to his nineteen-year-old daughter. The text messages included a photograph of Pendleton's kitchen covered in fire extinguisher dust and a photograph of Curit lying on a doorstep, seemingly unconscious or dead. The text messages included three statements: (1) "i hit hard fuckermy hNd hurts frim destroying somethimg half your size," (2) "i have broken knuckeles," and (3) "I have abroken hand."

[¶5]   Early the next morning, Pendleton sent his estranged wife a text message that read, "Kevin is gone i just found him dead.  Im sad i think ge hit his head i pulled him inside after i asked him to leave. He is dead."  Later that morning, Pendleton and his wife spoke on the phone.  Pendleton was extremely upset.  Pendleton said that he had not called 9-1-1 and that he did not want to go to prison.  He also said that he and Curit had been "fighting," "getting on each other's nerves," and drinking for the past couple days.  He said that he found Curit lying face down in the camper.

[¶6]  A half an hour later, at 9:39 a.m., Pendleton called 9-1-1.  During the call, Pendleton told the dispatcher that Curit had been dead for a "long time."  Pendleton said that he had asked Curit to leave the house multiple times and that Curit was a very "hard person to deal with."  Pendleton added that Curit kept falling down and hitting himself, that the dog may have attacked him, and that Curit had "a lot of health problems."  Pendleton said Curit was in the camper and that Pendleton had "put heat in there."

[¶7]  After the police arrived, Pendleton told them that Curit had chronic obstructive pulmonary disease and may have died from spraying himself in the face with a fire extinguisher.  Pendleton also told them that Curit did not have his inhaler and may have died from not being able to breathe.  He added, "I'm apparently screwed but like I, I didn't kill Kevin."

4

[¶8]  The police found Curit lying supine on the floor of the camper with a sleeping bag partly covering him.  Curit was not wearing a shirt, his pants were around his ankles, he had on only one sock, and the back of his underwear was slightly rolled down.  The temperature inside the camper was in the 20s, and the camper did not appear to have been lived in.  A space heater was plugged in but not turned on.

[¶9]  Police investigators found a significant amount of blood, including blood spatter and blood stains, outside Pendleton's house, inside the house, on various clothing items in the house, and on the outside of the camper.  There was blood on a dog collar in the living room and on a belt in the kitchen.  The bathroom trash and kitchen trash contained bloody paper towels.  Through DNA testing, a state forensic analyst determined that all the blood that was tested, including the blood on the dog collar and belt, was Curit's.

[¶10]  An autopsy performed by the state's medical examiner revealed that Curit was 5'4" tall and weighed 132 pounds.  His blood alcohol content was .22 grams of alcohol per 100 milliliters of blood at the time of death.  Curit sustained numerous injuries within hours before his death, including abrasions and contusions on his chest, an abrasion on his chin, a four-inch-by-two-inch contusion on his forehead, a contusion on his right eyebrow, an abrasion and contusion on his nose, abrasions and contusions on his arms and legs, an

extensive hemorrhage in the scalp across his forehead, a hemorrhage on the back of his head, and a bitemark on his tongue. The entire left side of Curit's face was swollen. Curit's left ear, which had been healing from a previous injury, had a large laceration and exposed fractured cartilage. Curit had multiple, lateral abrasions and contusions across his sides and back, and he had leaves and debris stuck to his back from being dragged. Curit had two rib fractures. Based on the location of lividity on Curit's body, he likely died in a prone position and remained there for a period of time, and was later turned onto his back, which is how he was found.

[¶11] The State's medical examiner concluded that Curit had died of strangulation by ligature.[1] The ligature itself was not found, but it had left its mark—a relatively uniform, approximately one-inch-wide band around the front of Curit's neck. Other evidence of ligature strangulation included broken thyroid cartilage in Curit's neck, one petechial hemorrhage in the left eye, and

---

[1] Pendleton presented expert testimony at trial that Curit was in poor health and that he caused the injuries to himself, consistent with his medical records showing that he had sustained many injuries in the months before his death due to falling while intoxicated. The defense's medical expert testified that he initially suspected ligature strangulation as the cause of death but that the lack of certain indicators commonly seen in strangulation cases would have led him to categorize the death as "undetermined." He opined that the "band-like abrasion" on Curit's neck—though consistent with strangulation—could have been caused by something else, such as by falling on an object facedown followed by a seizure. The defense expert further opined that hypothermia may have contributed to or caused Curit's death, as evidenced by "leopard spots" that appeared on Curit's stomach lining.

6

a hemorrhage on the superior and inferior surfaces of the muscle that extends from the mandible to the clavicle.

## B. Procedure

[¶12] Pendleton was arrested, and on January 9, 2023, the State charged Pendleton by complaint with murder. A grand jury indicted Pendleton for intentional or knowing murder or depraved indifference murder, in violation of 17-A M.R.S. § 201(1)(A)-(B) (2024). Pendleton pleaded not guilty. In June 2023, the court held a pretrial bail hearing at Pendleton's request, *see Harnish v. State*, 531 A.2d 1264 (Me. 1987), and thereafter ordered that Pendleton remain in custody without bail pending trial. Before trial, Pendleton filed nearly a dozen motions, three of which are relevant to his appeal.

[¶13] The first is a motion in limine that sought to exclude from evidence the text messages that he had sent to his daughter on January 5, 2023. The text messages included threats against the daughter's boyfriend, comments about Pendleton's own physical and emotional state, and the photographs of Pendleton's kitchen and Curit lying on the doorstep. Pendleton argued that the text messages were not relevant and that any probative value was outweighed by the danger of unfair prejudice and the risk that the evidence would confuse the jury about the issues or mislead the jurors about the fact finding they had to undertake. He also argued that the messages threatening the boyfriend

constituted improper character evidence. A second motion in limine sought to exclude his daughter's testimony about the text messages on the grounds of relevance and the danger of unfair prejudice, confusion of the issues, or misleading the jury. A third motion in limine sought to exclude the State's designated expert witness on cell phone data extraction as a sanction for the State's late disclosure of the expert's report.

[¶14] After a hearing, the court granted Pendleton's motion to exclude the State's expert witness. Regarding the other two motions in limine, the court ruled that all text messages conveying threats against Pendleton's daughter's boyfriend were inadmissible but that three text messages containing the photographs of Curit and the kitchen and the statements by Pendleton about injury to his hands were relevant and therefore admissible. The court denied Pendleton's request to preclude his daughter from testifying about the three text messages.

[¶15] On the first day of trial, Pendleton's daughter testified. She testified that her relationship with her father was "[c]omplicated" and that around the time of Curit's death, the communication between them was one-sided in that her father would reach out to her, "[u]sually through texts," but she "didn't really respond much." When asked by the State about Pendleton's alcohol use, she said that he drank "quite a bit." She further

testified that when he drank to the point of intoxication, his behavior changed, causing her to distance herself from Pendleton because "he was unpleasant to be around." Pendleton did not object to this testimony, though he objected to the admission of screenshots of his text messages during the daughter's testimony. The court overruled his objections.

[¶16] On the third day of trial, the court held a conference with the parties to discuss the potential testimony of a jailhouse informant. The State made the following proffer:

> We expect his testimony to essentially be that . . . he was pod mates with the defendant and in kind of mid-January the defendant began . . . opening up to him unsolicited. . . . [H]e would say that while watching TV at night the defendant came over to him and started making statements about the case. It began with a strange sort of description of why the defendant was in custody. He said he was in custody for murdering someone, which to [the informant] was unusual because usually people say they're in custody because, you know, they think I killed someone or I allegedly killed someone. But the way he said it had a different tenor to it than how most inmates describe why they're being held. He gave details about the crime, including that the guy he murdered was a drunk, he kicked the guy out, the guy came back so he beat him up. The next night he lit the guy on fire, then put him out with a fire extinguisher. He hoped that would kill him, but it didn't work. He let his dog attack the guy hoping that would kill the guy, but it didn't work. He couldn't take it anymore. They got into a fight over a pair of boots and he ended up strangling the guy to death and then he propped the guy up on the camper floor. Camper was on the property. He used his phone to send pictures of the dead guy to his friend and [Pendleton] said the coroner said the guy died of strangulation. . . . [The informant] wrote down some of the things on a notepad. I don't expect to try to introduce that into evidence, but I think it's

> potentially relevant about his ability to remember and whatnot. And [Pendleton] indicated that he'd been beating [Curit] for months . . . .

The State contended that the only way the informant could have learned this information is if Pendleton had told him. Pendleton argued that the informant was not credible and was trying to use information he could have obtained from other sources as "currency of inmate trade."

[¶17] The court ruled that the proffered testimony was probative but that there was a danger of unfair prejudice if the State revealed Pendleton's custodial status. The court ruled that if the State called the informant, it should ask leading questions to avoid disclosure of the witness's or Pendleton's custodial status.[2] The court warned that if Pendleton cross-examined the informant on any benefit that he hoped to receive in exchange for his testimony, the door could be opened to the custodial status issue, and the State would have an opportunity to offer rebuttal evidence. The State requested a recess to explain the court's ruling to the witness, which the court granted.

---

[2] The State proposed wording for its direct examination in light of the court's ruling. Pendleton objected to the proposed wording and offered his own: "[O]n such and such a date did you have occasion to speak with Matthew Pendleton. Did a conversation take place. During that conversation did he make some statements to you that related to what you understood to be the criminal case against him. Among those statements did he tell you X, Y, and Z." Addressing the State's concern that it needed to provide some context, the court suggested that the State ask only "whether or not he's acquainted with this particular defendant" and "how long he may have been acquainted with the individual."

[¶18]  After the recess, the State called the informant, who testified as follows:

Q.    . . . . Are you acquainted with Matthew Pendleton?

A.    Not really.

Q.    Okay.  Have you had the occasion to talk to him before?

A.    Yes, sir.

Q.    And was that in January of 2024?

A.    Yes.

Q.    And did he talk to you about this case?

A.    Yes, he did.

Q.    All right.  Did he tell you that he murdered somebody?

A.    Not with those exact words, but yes.

Q.    What did he say?

A.    He said he was in jail for murdering somebody.  So yeah, I guess he did say he murdered somebody.

[¶19]  Pendleton immediately requested a sidebar conference, during which he moved for a mistrial.  Pendleton argued that if the court did not grant a mistrial, then the court should strike the testimony and excuse the witness, "[w]hich would not completely undo the harm, but would substantially undo the harm and would allow us to move forward at this point."  After confirming that it had instructed the witness not to mention "jail" at all, the State argued

that the isolated statement could be cured with a jury instruction. The court noted that the informant's answer was nonresponsive to the State's question and expressed concern about the State's ability to control the witness, given that he "either intentionally or inadvertently" testified about an area that he had been told to avoid. The court stated that "the custodial status of the defendant has now been aired to some small degree at least at this point, but one that was clear to this jury." The court denied Pendleton's motion for a mistrial but ruled that the informant would not be questioned further, that his testimony would be stricken and that the jury would be instructed not to consider any of the informant's testimony.

[¶20] After the sidebar concluded, the court informed the jury that it needed to take a brief recess. During the recess, the court excused the informant witness. When the trial resumed, the court told the jury: "Mr. Foreman, men and women of the jury, the testimony of the last witness . . . has been, based upon a decision of the Court, stricken. And you are to give his testimony no weight whatsoever in your ultimate deliberations later on in these proceedings. State may call its next witness."

[¶21] On the fourth day of trial, after closing arguments, the court charged the jury. The court instructed the jury, inter alia, that when it had sustained an objection to testimony or ordered the jury to disregard testimony,

that testimony could be given no weight. The court also reminded the jury of the presumption of innocence. At Pendleton's request, an instruction for the lesser included offense of manslaughter was given to the jury. *See* 17-A M.R.S. § 203(1)(A) ("A person is guilty of manslaughter if that person . . . [r]ecklessly, or with criminal negligence, causes the death of another human being.").[3]

[¶22] On the fifth day of trial, the jury found Pendleton not guilty of murder but guilty of manslaughter.

[¶23] Two months later, the court held a sentencing hearing. Just prior to the hearing, the court met with the parties in chambers to discuss an affidavit that had been prepared by Pendleton's attorneys on behalf of one of the jurors.

[¶24] The juror's affidavit asserted that the jury had interpreted the evidence as follows:

- Curit did not die of ligature strangulation or due to other physical acts of Pendleton.

- Curit died of hypothermia as suggested by the defense expert.

- The photograph of Curit lying on the doorstep that Pendleton sent to his daughter showed that Curit was intoxicated and alive at that time.

- Pendleton dragged Curit inside to get him out of the cold.

---

[3] "A person acts recklessly with respect to a result of the person's conduct when the person consciously disregards a risk that the person's conduct will cause such a result." 17-A M.R.S. § 35(3)(A) (2024). "A person acts with criminal negligence with respect to a result of the person's conduct when the person fails to be aware of a risk that the person's conduct will cause such a result." *Id.* § 35(4)(A).

- When Pendleton dragged Curit inside, Curit's shirt rode up causing the abrasions on Curit's neck.

- At some point, Curit went out to the camper, where he succumbed to hypothermia.

- Pendleton acted with criminal negligence because he knew that Curit needed medical attention due to his "poor state of health and habitual intoxication," and Pendleton failed to call an ambulance.

Finally, the affidavit stated, "The theory of criminal negligence for not calling for assistance was the only basis for guilt that the jurors could unanimously agree on . . . . The jury verdict represented a collective view by the jury that [Pendleton] bore some responsibility for Kevin Curit's death, but on the lowest end of the spectrum of criminal conduct."

[¶25] The court questioned the appropriateness of the submission of the affidavit. Pendleton argued that, although it is "not typical or common" for a juror to be heard at sentencing, he could find no rule or case prohibiting it. The State argued that it was the province of the jury to decide whether the defendant was guilty but not to advise the court about the degree of the defendant's culpability. The State suggested that a juror who chooses to come forward and speak for the entire jury at sentencing is overly invested in the case.

[¶26] The court excluded the affidavit from its consideration at sentencing. Relying on Maine Rule of Evidence 606 for guidance, the court

stated that although the affidavit did not expressly challenge the validity of the verdict, it did purport to describe the reasoning behind the verdict and thereby undermined the confidentiality of jury deliberations. The court commented that whether the affidavit was accurate was irrelevant to sentencing, because assessing the evidence for purposes of sentencing is for the court, not the jury. The court stated that the parties could argue about the evidence that the jury heard and that the court should consider in its sentencing analysis. The court placed the affidavit under seal at Pendleton's request.

[¶27] After the parties' sentencing presentations, the court undertook the three-step analysis applicable in sentencing for Class A, B, and C crimes. *See* 17-A M.R.S. § 1602(1) (2024); *State v. Hewey*, 622 A.2d 1151, 1154-55 (Me. 1993). The court sentenced Pendleton to twenty years of imprisonment, with all but fourteen years suspended, followed by four years of probation. Pendleton was also ordered to pay $3,322.51 in restitution plus assessments to the Victims' Compensation Fund. Pendleton timely appealed. *See* 15 M.R.S. § 2115 (2024); M.R. App. P. 2B(b)(1). Pendleton also filed an application seeking leave to appeal his sentence based on the court's exclusion of the juror's affidavit. *See* 15 M.R.S. § 2151 (2024); M.R. App. P. 20. The Sentence Review Panel granted Pendleton's application. *State v. Pendleton*, No. SRP-24-182 (Me. Sent. Rev. Panel July 29, 2024).

## II. DISCUSSION

[¶28]  We discuss each of Pendleton's arguments in turn, beginning with his challenge to the admission of screenshots of his text messages and then turning to his challenges to the admission of his daughter's testimony, the court's rulings related to the jailhouse informant's testimony, and the court's refusal to consider the juror's affidavit for purposes of sentencing.

## A.     Admission of Screenshots of Pendleton's Text Messages

[¶29]  Pendleton argues that the court abused its discretion by denying his motion in limine as to three of the text messages that he sent his daughter around the time of Curit's death, reporting his injuries from "destroying" something half his daughter's size.  *See supra* ¶ 4.  Pendleton argues that the three messages were irrelevant and that the admission of the screenshots violated several rules of evidence, citing Rules 403, 404, 901, and 1002.

### 1.     Relevance

[¶30]   First, Pendleton contends that the text messages were inadmissible because they were not relevant.  We review a trial court's determination regarding the relevancy of evidence for clear error.  *State v. Buchanan*, 2007 ME 58, ¶ 8, 921 A.2d 159.  Relevant evidence is any evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would

be without the evidence. M.R. Evid. 401; *see also* M.R. Evid. 402 (providing that relevant evidence is admissible unless a rule or statute provides otherwise).

[¶31]  The State's proffered evidence suggested that Pendleton sent his daughter the three text messages shortly before or after Curit's death. The messages included a photograph of Curit lying on the ground unconscious or dead and Pendleton's statements that he "hit hard," that his hand hurt from "destroying somethimg half [his daughter's] size," and that his hand and knuckles were broken.

[¶32]  In *State v. Marquis*, 2017 ME 104, ¶¶ 13-14, 162 A.3d 818, we upheld the admission of text messages that the defendant exchanged with the victim less than twelve hours before her murder because they showed that the defendant was upset with her and the messages were therefore relevant to whether the defendant acted intentionally or knowingly in killing her. The court here did not err in determining, based on similar reasoning, that Pendleton's text messages were relevant to the cause of Curit's injuries and Pendleton's mental state at the time.

### 2. Probative Value and the Danger of Unfair Prejudice or Confusion of the Issues

[¶33]  Pendleton next contends that even if the text messages were relevant, their probative value was substantially outweighed by the danger of

unfair prejudice and the risk of causing the jury confusion. *See* M.R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). Pendleton argues that the jury would likely have had difficulty understanding the messages and could have been swayed by "the negative character implications" that Pendleton is a "bad person deserving of punishment." We review the trial court's weighing of probative value against the dangers identified in Rule 403 for an abuse of discretion. *See State v. Michaud*, 2017 ME 170, ¶ 8, 168 A.3d 802.

[¶34] As the State points out, the probative value of the text messages was high because the messages were evidence of, inter alia, Pendleton's conduct and state of mind at the time of Curit's death, and they were not unfairly prejudicial merely because they were damaging to Pendleton. *See State v. Allen*, 2006 ME 21, ¶ 13, 892 A.2d 456 ("To sustain a Rule 403 objection, the prejudice must be more than simply damage to the opponent's cause. It must be evidence that has an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one." (citation and quotation marks omitted)). Here, although the evidence was damaging to Pendleton's case, the court did not abuse its discretion in determining that the

significant probative value of the evidence outweighed the danger of unfair prejudice.

[¶35]   As to the risk of juror confusion, although the text messages described or discussed violence other than strangulation, the physical conflict between Pendleton and Curit on the night of January 5, 2023, formed the basis for the State's charges and was not the sort of collateral or tangential matter with which Rule 403 is concerned.  *See State v. Filler*, 2010 ME 90, ¶ 20, 3 A.3d 365 (concluding, for purposes of Rule 403, that evidence of a victim's motivation to fabricate was not a tangential matter that would result in a "trial within a trial" and confuse the issues); *cf. State v. Houston*, 534 A.2d 1293, 1294 n.1 (Me. 1987) (affirming the court's exclusion of detailed evidence about a collateral business dispute between the defendant and the victim "that was likely to confuse or mislead the jury").  Neither the difficulty arising from reading the poorly written text messages nor the content of those messages generated the type of "confusion" that would require their exclusion under Rule 403.

### 3.    Prior Bad Acts

[¶36]   Pendleton next contends that admission of the text messages violated Maine Rule of Evidence 404(b) because they describe "behavior unrelated to the charges" to imply that he had "a propensity for violent behavior

or conduct." Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." We review for clear error a trial court's decision to admit evidence over a Rule 404(b) objection. *State v. Hassan*, 2013 ME 98, ¶ 29, 82 A.3d 86.

[¶37] The State presented evidence suggesting that Pendleton had taken the photographs and made the statements in the three messages close in time to Curit's death. Contrary to Pendleton's argument, therefore, the trial court did not err in determining that the contents of the three messages constituted evidence that Pendleton had committed the crime with which he was charged and that the messages were not evidence of a "propensity for violent behavior" based on "other act[s]" within the meaning of Rule 404(b).

### 4. Authentication

[¶38] Pendleton contends that the court abused its discretion by admitting the screenshots of the text messages because the State did not properly authenticate them as required by Maine Rule of Evidence 901. Specifically, Pendleton contends that his daughter's testimony was insufficient to authenticate the text messages and that the State was required to offer metadata or expert analysis to establish their authenticity. Pendleton further contends that, even if the message came from his phone, there was insufficient

evidence to prove that he was the sender of the text messages. We review for clear error a trial court's findings that the foundation for evidence was properly established. *Marquis*, 2017 ME 104, ¶ 13, 162 A.3d 818.

[¶39] Rule 901(a) provides: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Rule 901(b) lists examples of evidence that satisfies the requirement, including testimony of a witness with knowledge that an item is what it is claimed to be, M.R. Evid. 901(b)(1), or evidence of the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances," M.R. Evid. 901(b)(4). The Rule 901 standard "embodies a flexible approach to authentication reflecting a low burden of proof. If there is a question about the integrity of electronic data, that question generally goes to the weight of electronically based evidence, not its admissibility." *State v. Coston*, 2019 ME 141, ¶ 8, 215 A.3d 1285 (citation and quotation marks omitted).

[¶40] Here, Pendleton's daughter testified that Pendleton usually communicates with her through text messages, that she has his number stored in her phone under the contact "Dad," and that the text messages that she received came from him. Regarding the photos in the text messages,

Pendleton's daughter testified that she recognized Pendleton's kitchen in the photograph because she had been there before and that she recognized Curit in the second photograph because he had been a family acquaintance and her father's housemate. Her testimony about the appearance, contents, and receipt of the text messages from Pendleton was sufficient to authenticate them as being what they purported to be; expert testimony to authenticate them was not required. *See State v. Turner*, 2001 ME 44, ¶¶ 3, 6, 766 A.2d 1025 (concluding that a jury could have rationally concluded that the defendant authored the emails that were sent from his email address even though no direct evidence was offered to establish it).

### 5. Best Evidence Rule

[¶41] As to the text messages, Pendleton finally argues that admission of screenshots of the messages violated the "best evidence" rule. Pendleton contends that screenshots do not comply with Maine Rule of Evidence 1002 and that the State needed to offer "the original digital messages" by "extracting them directly from the device." Pendleton contends that screenshots are "secondary evidence" because they do not contain metadata. We review a trial court's application of the best evidence rule for an abuse of discretion. *State v. Jandreau*, 2022 ME 59, ¶ 1 n.3, 288 A.3d 371.

[¶42] Rule 1002 provides: "An original writing, recording, or photograph is required in order to prove its content unless these rules or a statute provides otherwise." A "writing" consists of "letters, words, numbers, or their equivalent set down in any form." M.R. Evid. 1001(a). An "original" of a writing means "the writing . . . itself or any counterpart intended to have the same effect by the person who executed or issued it." M.R. Evid. 1001(d). For electronically stored information, "original" means "*any* printout—or other output readable by sight—if it accurately reflects the information." *Id.* (emphasis added). A "photograph" means "a photographic image or its equivalent stored in any form." M.R. Evid. 1001(c). An "original" of a photograph includes "the negative or a print from" the negative. M.R. Evid. 1001(d).

[¶43] The best evidence rule applies when the evidence offered for admission is a "writing" or "photograph," the content of which is materially at issue. *See* M.R. Evid. 1002, 1004(d) (stating that the rule does not apply where the writing or photograph "is not closely related to a controlling issue"). "The content is at issue if the party seeking to prove a fact is trying to prove what a particular writing, recording or photograph says or shows." *State v. Legassie*, 2017 ME 202, ¶ 26, 171 A.3d 589 (quotation marks omitted).

[¶44] In *Legassie*, we held that digital messages sent through Facebook Messenger were "writings" for purposes of the best evidence rule and that the

received messages constituted "originals." 2017 ME 202, ¶¶ 5-7, 30, 33-37, 171 A.3d 589. We concluded that the court did not err in admitting a printout of the digital messages instead of the message on the device where there was no dispute about the accuracy of the content of the printout. *Id.* ¶¶ 5-7, 42. Similarly, the text messages sent by Pendleton to his daughter are "writings" and "photographs" within the meaning of the best evidence rule, and Pendleton does not challenge the accuracy of the screenshots. By sending text or photographs in a text message, the sender necessarily intends the recipient to be able to read or view a counterpart to what the sender typed or sent. The text and photographs that were contained within the text messages that Pendleton's daughter received are "originals" within the meaning of the best evidence rule because they were received as counterparts in a form that was readable by sight. *See id.* ¶¶ 35-35. The admission of printouts rather than extractions from the daughter's phone "was no error because [Pendleton] does not dispute the accuracy of the content of the printout of the messages." *Id.* ¶ 42.

## B.  Admission of Pendleton's Daughter's Testimony

[¶45]  Pendleton argues that the court erred or abused its discretion by admitting his daughter's testimony about his alcohol use and their "complicated" relationship because it was not relevant to any fact of consequence. Pendleton further argues that even if her testimony was relevant,

it should have been excluded under Rule 403 because its limited probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.[4]

### 1. Preservation and Review

[¶46]  The State argues that Pendleton's argument is unpreserved and should be reviewed for obvious error.  Pendleton contends that he preserved the argument because he filed a motion in limine seeking to exclude his daughter's testimony on the ground that "[a]ny testimony" that his daughter could provide would be irrelevant.  We conclude that the argument is unpreserved.  At the hearing on the motions in limine, the court asked Pendleton whether the motion seeking to exclude his daughter's testimony was distinct from the motion seeking to exclude the text messages, and Pendleton agreed with the court that the motions were "[a]ll on the same subject."  Furthermore, Pendleton did not object to the daughter's testimony at trial, except as it pertained to the admission of the text messages.

[¶47]  For these reasons, we review the admission of the daughter's testimony for obvious error.  *See State v. Farley*, 2024 ME 52, ¶ 40, 319 A.3d

---

[4] Pendleton argues for the first time in his reply brief that his daughter's testimony also should have been excluded pursuant to M.R. Evid. 404(b) because it referred to wrongful acts by Pendleton. Issues raised for the first time in a reply brief are waived.  *See State v. Smith*, 2024 ME 56, ¶ 20 n.6, 320 A.3d 405.

1080 (reviewing unpreserved claims for obvious error); M.R.U. Crim. P. 52(b) ("Obvious errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."); *State v. Pabon*, 2011 ME 100, ¶ 29, 28 A.3d 1147 ("For an error or defect to be obvious for purposes of Rule 52(b), there must be (1) an error, (2) that is plain, and (3) that affects substantial rights. If these conditions are met, we will exercise our discretion to notice an unpreserved error only if we also conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings.").

### 2. Relevance and Unfair Prejudice

[¶48] Given the absence of any apparent motive for Pendleton to assault Curit, the State's theory was that Pendleton is volatile when he is intoxicated, that he was intoxicated on the evening of Curit's death, and that he strangled Curit to death. The daughter's brief testimony that her father is an "unpleasant" person to be around when he drinks alcohol lent some support to the theory and could have been taken to explain the lack of an apparent motive for killing Curit. Additionally, the daughter's testimony that she has a "[c]omplicated" relationship with her father was relevant to explain why communication between them was usually through text messages. Although the testimony could have been somewhat prejudicial to Pendleton, the court, had it been

asked to rule on the issue, could have reasonably determined that the testimony's probative value for purposes of addressing motive and establishing a foundation for the screenshots of the text messages was not substantially outweighed by the danger of unfair prejudice for purposes of Rule 403. Moreover, Pendleton has not challenged, either at trial or on appeal, the admission of similar testimony from two other witnesses about his alcohol use and his angry behavior and incoherent communications when intoxicated. We see no obvious error in the admission of the daughter's testimony. *See Pabon*, 2011 ME 100, ¶ 29, 28 A.3d 1147.

## C. The Jailhouse Informant's Testimony and the Motion for Mistrial

[¶49] Pendleton raises numerous arguments related to the testimony of the jailhouse informant that Pendleton told him that he was "in jail for murdering somebody," but we need not consider most of the objections because the informant testified only briefly and the court ordered the entirety of his testimony stricken, with an instruction to the jury to disregard it.[5] The

---

[5] Pendleton argues that the informant's testimony was unreliable and that jailhouse informants generally should not be permitted to testify because their testimony is "inherently unreliable." The court did not err by ruling that an incarcerated person could testify. *Cf. State v. Hussey*, 521 A.2d 278, 280-81 (Me. 1987) (indicating that a child's testimony is not inherently unreliable); *State v. Cedre,* 314 A.2d 790, 799 (Me. 1974) (stating that addiction does not make a witness inherently unreliable). Moreover, the proffered testimony—that Pendleton gave the informant a detailed account of having assaulted and strangled Curit—would have been highly probative of the issues at trial had it been admitted, and although the testimony would have been prejudicial to Pendleton, it would not have been *unfairly* prejudicial given the nature the testimony and the restrictions that the court placed on the State in eliciting the testimony. *See* M.R. Evid. 401, 403.

only question we need to decide concerning the informant's testimony is whether the court abused its discretion in denying Pendleton's motion for a mistrial. Pendleton argues that the steps the court took—excusing the witness, striking his testimony, and issuing a curative instruction to the jury—were insufficient to mitigate the prejudicial impact of the disclosure that he was in custody.

[¶50] "In recognition of the trial court's superior vantage point in ruling on a motion for a mistrial, we review the denial of such a motion for an abuse of discretion. We will vacate a court's denial of a motion for a mistrial only when there is prosecutorial bad faith or there are exceptionally prejudicial circumstances." *State v. Nobles*, 2018 ME 26, ¶ 17, 179 A.3d 910 (citation and quotation marks omitted). "Generally, when a witness testifies to inadmissible evidence, a defendant is only entitled to a curative jury instruction, not a mistrial. If the court has opted to provide a curative instruction, we will not disturb its decision unless the court committed clear error by not finding that the jury's exposure to prejudicial inadmissible evidence would incurably taint the jury's verdict." *Id.* ¶ 18 (citation and quotation marks omitted). We also presume that the jury will follow the court's instructions. *Id.*

[¶51] For a jury to learn that a defendant has been or is incarcerated does not automatically justify a mistrial: "The case law is clear that when jurors may

have learned of the defendant's incarceration status, the duration and significance of the information matters." *State v. Retamozzo,* 2016 ME 42, ¶ 8, 135 A.3d 98; *id.* ¶¶ 6-9 (holding that a trial court's failure to declare a mistrial *sua sponte* after a witness's brief reference to visiting the defendant in jail was not obvious error). Although the informant's unexpected statement that he and Pendleton were in jail was inadmissible, it was as brief as the witness's statement in *Retamozzo*. It also cannot have come as a complete shock to the jury to learn that a person charged with murder was in jail at some point before trial. Further, we have affirmed denials of motions for a mistrial when the trial court took fewer remedial measures in addressing similarly inadmissible, potentially prejudicial evidence. *See Nobles*, 2018 ME 26, ¶¶ 16-19, 179 A.3d 910 (curative instruction after disclosure of a defendant's probation status); *State v. Brooks*, 366 A.2d 179, 182–83 (Me. 1976) (curative instruction after disclosure of defendant's prior imprisonment); *State v. Weidul*, 649 A.2d 318, 319 (Me. 1994) (no remedial measure after disclosure of prior incarceration when the defendant twice declined the offer of a curative instruction); *State v. Cochran*, 2000 ME 78, ¶¶ 25-29, 749 A.2d 1274 (no remedial measure after a brief reference to a defendant having been on parole). The trial court here responded with every remedial measure short of declaring a mistrial, and Pendleton acknowledged at trial that such remedial measures "would

substantially undo the harm." In denying Pendleton's motion for a mistrial, the court did not err, much less commit obvious error.

## D.    The Court's Refusal to Consider the Juror's Affidavit in Sentencing

[¶52] Pendleton argues that the court abused its discretion by excluding from its consideration of mitigating circumstances in its sentencing analysis the juror's affidavit purporting to describe how the jury viewed the evidence and Pendleton's culpability. In substance, the affidavit asserted that the jury found that Curit died due to hypothermia and not because of strangulation or any other act by Pendleton; that Pendleton tried to save Curit by dragging him out of the cold into the house, though Curit at some point made his own way out to the camper; and that Pendleton was guilty only of criminal negligence in failing to call for help. Pendleton argues that the affidavit "presented [his] conduct in a light far more favorable than the conduct upon which [he] was sentenced" and that the court abused its discretion by not considering the juror's perspective in determining the facts for sentencing purposes.

[¶53] "Courts have broad discretion in determining what information to consider in sentencing; they are limited only by the due process requirement that such information must be factually reliable and relevant." *State v. De St. Croix*, 2020 ME 142, ¶ 11, 243 A.3d 880 (quotation marks omitted); *see also State v. Bentley*, 2021 ME 39, ¶ 13, 254 A.3d 1171. However, our

jurisprudence imposes strict limits on a court's consideration of information about a jury's deliberations and the reasons for the jury's verdict. "It is the general rule since Lord Mansfield's time that the testimony of a juror is not available to impeach a verdict in which [the juror] participated." *Patterson v. Rossignol*, 245 A.2d 852, 856 (Me. 1968). Rule 606(b) of the Maine Rules of Evidence codifies that principle in providing that "[d]uring an inquiry into the validity of a verdict or indictment, a juror may not testify about . . . [t]he effect of anything on that juror's or another juror's vote[] or [a]ny juror's mental processes concerning the verdict or indictment." M.R. Evid. 606(b)(1)(B), (C). The rule has two exceptions: "A juror may testify about whether . . . (A) Extraneous prejudicial information was improperly brought to the jury's attention; or (B) An outside influence was improperly brought to bear on any juror." M.R. Evid. 606(b)(2).

[¶54] The juror's affidavit that Pendleton presented to the court made no mention of anything in the nature of extraneous prejudicial information or an improper outside influence that might have justified an inquiry into the verdict pursuant to Rule 606. The court was well within its discretion in refusing to consider for purposes of sentencing one juror's after-the-fact interpretation of the evidence and the jury's reasoning.

The entry is:

Judgment of conviction and sentence affirmed.

_____

Christopher MacLean, Esq. (orally), Dirigo Law Group LLP, Camden, for appellant Matthew W. Pendleton

Aaron M. Frey, Attorney General, and Katie Sibley, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Waldo County Unified Criminal Docket docket number CR-2023-18
FOR CLERK REFERENCE ONLY